### GALVESTON TRUCK LINE CORPORATION v. STATE.

No. 12785.

Court of Civil Appeals of Texas. Dallas.

Dec. 17, 1938.

Rehearing Denied Jan. 14, 1939.

Ralph W. Currie and Frank A. Leffingwell, both of Dallas, for appellant.

James Noel, Asst. Atty. Gen., and Harold McCracken, of Dallas, for the State.

BOND, Chief Justice.

The State of Texas, through its Attorney General and Criminal District Attorney of Dallas County, filed suit in a District Court of Dallas County, under section 16 of the Texas Motor Carrier Act (art. 1690b, Vernon's Ann.P.C.), alleging that appellant, Galveston Truck Line Corporation, during the month of April, 1937, transported over the State highways seven shipments of paint and allied products from Dallas, Texas, to Abilene, Eastland, Lubbock, and Sweetwater, Texas, as a motor-freight carrier, for hire, without first securing a certificate or permit from the Railroad Commission of Texas. Appellee sought judgment for penalties, a temporary restraining order, a temporary injunction, and a permanent injunction, prohibiting appellant from transporting such commodities in intrastate commerce.

Appellant filed answer, denying the intrastate character of the commodities transported, and in cross-action alleged that it is a contract-carrier engaged solely in the transportation of interstate commerce, authorized by the Federal Motor Carrier Act 1935, 49 U.S.C.A. § 301 et seq., and that the seven shipments complained of by appellee consisted wholly of interstate commerce, which moved into Dallas, Texas, by rail and moved out by appellant's auto freight line, under transit arrangements published and filed with the Interstate Commerce Commission. Appellant sought an order permanently enjoining members of the Railroad Commission

of Texas, and their agents, servants, and employes from interfering with transportations by appellant of shipments similar to those involved in said operations.

The case was submitted to the court on an agreed statement of facts, resulting in the trial court rendering judgment against appellant and perpetually restraining and enjoining it from transporting wholly within the State of Texas commodities manufactured and processed in Dallas, Texas, from raw materials produced or purchased from various sources of supply outside of the State of Texas and shipped into the State; but refused to allow appellee the penalties for violation of the act.

The appellant, Galveston Truck Line Corporation, is an Oklahoma corporation, authorized to engage in the transportation of property as a contract-motor carrier, under special and individual contracts or agreements, over the public highways moving in interstate commerce. On and prior to April 1, 1937, appellant entered into and filed with the Interstate Commerce Commission separate individual contracts with each of the subsidiary companies hereinafter named. The contracts provide for the transportation from Dallas, Texas, to branch stores and retail distributors of paints and allied products which originate at out-of-state points, or are manufactured at Dallas, Texas, from raw materials shipped from out-of-state points for the purpose of manufacture or process at Dallas. Such contracts include transit-tariff covering goods stored in transit at Dallas, as well as goods milled, fabricated or manufactured at Dallas, and provide that the shipper shall furnish evidence at the time the goods are offered for transportation, the products or the raw materials from which they were made had moved from an out-of-state point, to Dallas, Texas, and had been on hand at the transit point not to exceed a period of twelve months. The transportation contracts name proportional rates applicable from Dallas, Texas, to the various named destinations, and provide that such rates shall apply on shipments subject to the transit tariff when moved in truck-loads of 7,000 pounds, or more.

Under the terms of said transportation contracts, appellant moved the seven truck-loads of paint from Dallas, Texas, to Texas destinations. The commodities were shipped by subsidiaries of Sherwin-Williams Company of Ohio and consigned to retail distributors at destinations. Appellant also transported under its contracts two shipments of paint from Sherwin-Williams Company of Texas at Dallas, to its branch houses at Wichita Falls and Brownsville, Texas.

It is admitted that appellant has the legal right to transport interstate commerce for hire over highways of Texas, and the sole question to be determined in this appeal is whether under the following facts and conditions the shipments involved in this suit and similar shipments constitute "interstate commerce" or "commerce among the several states" within the meaning of Clause 3, Section 8, Article 1, of the Constitution of the United States, U.S.C.A.

The Acme White Lead & Color Company, Lincoln Paint & Color Company, Martin-Senaur Company, and the Sherwin-Williams Company of Texas, are private corporations permitted to transact business in Texas. The Sherwin-Williams Company of Ohio has no permit from and does not do business as such in the State of Texas. Its business conducted in Texas is done through the above named subsidiary corporations, which are wholly owned and controlled by it. The plan of operation pursued by the Ohio corporation and its subsidiaries is substantially as follows:

The Sherwin-Williams Company of Ohio and its subsidiaries are engaged in the production or manufacture of paints and allied products. Eighty-five percent of their products sold in Texas are manufactured in a factory at Dallas, Texas, which is owned and operated by the Lincoln Paint & Color Company. All raw materials used in the manufacture of those products are produced or purchased by the Ohio corporation from various sources of supply, all of which are outside of the State of Texas, shipped to Dallas by railroad, in car-load quantities, on requisition from the Dallas factory, and placed in storage until used in the manufacturing process. At the time the raw materials are requisitioned and shipped, the ultimate destination of the finished products is not known, but it is known that ultimately the raw materials will be processed and manufactured at Dallas into finished commodities, stored and thereafter shipped out to subsidiary branch stores or privately owned retail distributors for sale to the consuming public.

Every subsidiary has its own particular formula for each of its manufactured products, so, when the raw materials are drawn from storage, they are subjected to a manufacturing process according to the formula of the particular subsidiary for which the finished product is being manufactured, then packed and labeled with the label of the subsidiary whose formula was used, and statistically inventoried by the head of the statistical department of the Acme White Lead & Color Works, located at Detroit, Michigan. Such finished products are held in the Dallas factory inventory until shipped out to various branch houses of the subsidiary for which the products were manufactured, or to retail distributors for sale to the consuming public.

Fifteen percent of the paints and allied products sold in Texas through the above named subsidiaries are manufactured in factories located outside of the State of Texas, owned and operated by the Sherwin-Williams Company of Ohio. Those commodities are also moved into Texas by rail in car-load quantities, placed in the Dallas factory warehouse, and commingled with the products manufactured at Dallas. Those finished products are shipped to Dallas with the intention of the shipper that they will be in storage at Dallas until sold to retail distributors through the sales organization of the subsidiaries, or until requisitioned by subsidiary branch houses in the same manner as products manufactured at Dallas. Such products manufactured outside of the State of Texas remain in the Dallas factory's storage warehouse for six (6) months; and are rendered for state, county, and muncipal taxation along with all materials and finished .products, if physically in possession of the subsidiaries at Dallas, Texas, on the first day of January of each year.

Forty percent of the commodities passing through the Dallas plant, including those shipped to the Dallas plant for storage as well as those manufactured there, are sold to the consuming public by subsidiary branch stores, and the goods are forwarded from Dallas to the branch stores upon receipt of transfer requisitions; and sixty percent of the goods are sold to the consuming public by retail distributors, to which they are shipped by the subsidiary companies which sell and collect for the paint manufactured and sold under their respective labels. The freight charges on such shipments are prepaid, and all claims for loss or damage to goods thus shipped are made by the subsidiary shown as the bill-of-lading consignor, and not by the retail distributors.

■ From the above related record, it will be clearly. recognized that there was an interruption of the shipments at Dallas, Texas, as a result of the manufacturing process. The raw materials came to rest, without guide or chart as to the. ultimate destinations of the finished products, and as to where and when, if ever, and to whom the finished products would be sold, or how such products would reach the consuming public. The raw materials were shipped to Dallas under contracts or bill of lading, entered into with the railroad company, freight prepaid, without orders or transit arrangements, to deliver such shipments to Lincoln Paint & Varnish Company; thus delivered, the undertaking by the railroad carrier was complete and the products then became a part of the general property of the state, subject to its laws and transportation regulations. Neither the fact that the raw materials had come from outside of the state nor the intention of the owner that the finished products eventually would be shipped from Dallas to other Texas destinations, can be deemed controlling on the character of the transportation, subsequently entered into with the appellant under arrangements not contemplated in the original shipments.

■ The raw materials were shipped and held by the Sherwin-Williams Corporation of Ohio, in Dallas, for its own purposes. It was manufactured and processed into finished products for itself and its subsidiaries, stored into its warehouses, inventoried and labeled to the subsidiary whose formula was used in the manufacture, and commingled with other property in storage belonging to them. Thus, we think, the products reached their final destination and became a part of the general mass of the state property, at Dallas, Texas. Its interstate character came to rest because the raw materials had no other particular destination at the time they were shipped or at the time they were received, manufactured, and processed, but were delivered to the shipper and stored at Dallas pending disposition. Mere intention by the owner ultimately to ship the finished products manufactured and processed in Texas from raw materials

shipped from out of the state does not put them in interstate commerce. The character of the shipment in such a case depends upon all the evidential circumstances, looking to what the owner has done in carrying out the journey.

In support of this view, attention is directed to the decision of the Supreme Court of the United States, in the Arkadelphia Milling Co. v. St. Louis Southwestern R. Co. et al., 249 U.S. 134, 39 S. Ct. 237, 63 L.Ed. 517. That case involves in part a movement of rough lumber from the woods of Arkansas to the milling plant in the same state. At the mill, rough lumber was manufactured into finished products such as staves, headings, and hoops. About 95% of the finished products were shipped from the mills to points in other states, and the question presented was, whether the transportation of the rough lumber to the mills was interstate in character because of the large shipment of the finished products to points beyond the state. The same principle of law is involved here, differs only, in that, the movement of the rough lumber was within the state, while the movement of the finished product was interstate; whereas, in the case at bar, the movement of the raw materials was interstate, while the transportation of the finished products is intrastate. On this question, the court said [page 244]: "Upon the facts as stated, it is our opinion that the District Court erred in treating the movement of the rough lumber from the woods to the milling point as interstate commerce. It is not merely that there was no continuous movement from the forest to the points without the state, but that when the rough material left the woods it was not intended that it should be transported out of the state, or elsewhere beyond the mill, until it had been subjected to a manufacturing process that materially changed its character, utility, and value. The raw material came to rest at the mill, and after the product was manufactured it remained stored there for an indefinite period—manufacture and storage occupying five months on the average—for the purpose of finding a market. Where it would eventually be sold no one knew. And the fact that previous experience indicated that 95 per cent. of it must be marketed outside of the state so that this entered into the purpose of the parties when shipping the rough material to the mill, did not alter the character of the latter movement. The question is too well settled by previous decisions to require discussion. Coe v. [Town of] Errod, 116 U.S. 517, 525, 6 S.Ct. 475, 29 L.Ed. 715; Bacon v. [People of State of] Illinois, 227 U.S. 504, 515–516, 33 S.Ct. 299, 57 L. Ed. 615; McCluskey v. Marysville & Northern R. Co., 243 U.S. 36, 37 S.Ct. 374, 61 L.Ed. 578."

■ The remaining 15% of the traffic handled by the Galveston Truck Lines for the paint companies is of a slightly different character. The manufactured products, instead of the raw materials, moved into Dallas in interstate commerce, was placed in storage, commingled with the products manufactured and processed at the Dallas factory. The shipments are sent to Dallas with the intention that they would remain in storage for an indefinite period not to exceed six (6) months, for the purpose of finding a market at other interior points in Texas. The ultimate destination to interior points in Texas is not known, and until a sale is made and the ultimate destination determined, the products remain in storage, subject to transportation arrangements, and the quantity of products requisitioned or sold. We are of the opinion the transportation from the warehouse to other points in Texas is intrastate commerce.

In this connection, attention is directed to the decision of the Supreme Court of the United States in the case of the Atlantic Coast Line R. Co. v. Standard Oil Co. of Kentucky, 1927, 275 U.S. 257, 48 S.Ct. 107, 72 L.Ed. 270. This case involved petroleum products which were imported from the Republic of Mexico, stored in tanks at Tampa, Florida, and later sold and shipped to interior points in the State of Florida. The Supreme Court held that the transportation from Tampa to other points in Florida was intrastate commerce and within the regulation of state authority.

■ Appellant contends that the publication of proportional rates under transit tariffs providing for a hook-up between inbound and outbound movements are themselves evidence of an intention on the part of the shipper to continue the interstate journey to a point beyond the transit point within the period provided in the transit tariff. Indeed, the intention of the shipper is an important factor in determining the character of the transportation be-

yond the point of transit; but, in the case at bar, it will be observed that the acts done were inconsistent with the intention of the shipper that the movements of the goods would be a continuous journey. The continuity of the journey evidently was broken, notwithstanding the intention of the shipper. The commodities were shipped to Dallas as their final destination, no leg of a continuous journey; and, to carry them on beyond the point of transit, a new and independent contract, under different shipping arrangements and mode of carriage, was made and acted upon, and was not within the contemplation of the shipper at the point of origin. The actual reshipment under such transportation contracts and transit tariffs was not a consummation of the original intention and, under such conditions, the journey was not interstate commerce.

In State of Florida v. Seaboard Air Line R. Co., 92 Fla. 61, 109 So. 656, the Supreme Court of Florida considered the question of whether oil brought to Jacksonville and Tampa from without the state and thereafter transported to points within the state constituted interstate or intrastate commerce. The court, in part, said [page 662]: "It affirmatively appears from the allegations of the writs and the averment of the answers that the actual transportation of the petroleum and petroleum products ceases at Tampa and Jacksonville; that the warehouses and storage tanks are the property of the oil companies; that, when placed in the storage tanks and warehouses of the oil companies, it is withdrawn from the carriers which transported it to Florida; that subsequent movements are the result of new contracts of carriage with the respondents, and the time of such subsequent movements is indefinite and dependent upon the convenience and pleasure of the oil companies; that an indeterminate quantity of the products brought in any one shipment to Florida may be disposed of by the companies to persons other than those for whom the particular shipment was originally intended. In this view of the facts, we are of the opinion that the petroleum and petroleum products stored in storage tanks and warehouses at Jacksonville and Tampa come to rest there; that the interstate movement ceases; and that subsequent shipments of it to points within the state are intrastate movements, * * *."

A "transit" is a stop-over privilege on a continuous journey granted by a carrier by which a break de facto in the continuity of carriage of goods is disregarded, and two legs of a journey are treated as though they were covered without interruption; it unites both legs into a through route for which a joint rate can be published. It is recognized that "transits" may, and often do, determine a continuous carriage. Baltimore & Ohio S. W. R. Co. v. Settle, 1922, 260 U.S. 166, 43 S.Ct. 28, 67 L.Ed. 189. Even so, but, when same creates a fictional through movement out of two separate movements, one of which might be interstate and the other intrastate, the fiction cannot be extended to the point of creating interstate commerce out of that which is essentially intrastate. In the instant case, the original shipments did not start on their interstate journey with a particular destination in the mind of the shipper; they were delivered to the shipper at Dallas, Texas, for its own purposes, and the shipper retained exclusive control of same; the goods were stored before and after manufacture and commingled with other products; they were rendered for taxation in Texas by the shipper, and 60% of same were distributed to retail dealers after sale from Dallas, and 40% to branch houses of the shipper located in the State of Texas; and, the reshipments from Dallas to other points in the State of Texas were under new and separate contracts of transportation and by different mode of transportation, truck instead of rail. We are of the opinion that the interstate movement ceased at Dallas, and that the subsequent shipments to points within the state were intrastate movements. The judgment of the court below is affirmed.

Affirmed.