The STATE of Texas, Appellant,

v.

SOUTHERN STATES TRANSPORTATION, INC., Appellee.

No. 3–87–155–CV.

Court of Appeals of Texas, Austin.

Aug. 10, 1988.

Rehearing Denied Sept. 14, 1988.

Jim Mattox, Atty. Gen., Norberto Flores, Asst. Atty. Gen., Austin, for appellant.

James M. Doherty, Austin, for appellee.

Before SHANNON, C.J., and GAMMAGE and ABOUSSIE, JJ.

ABOUSSIE, Justice.

The State of Texas sued Southern States Transportation, Inc. ("Southern States") seeking penalties and a permanent injunction for alleged violations of the Texas Motor Carriers Act. Tex.Rev.Civ.Stat.Ann. art. 911b (1964 and Supp.1988). The State appeals from a take-nothing judgment entered by the trial court. We will reverse the judgment.

For a period of 147 days between February and October 1983, appellee transported reinforcing steel ("rebar") for W. Silver, Inc. ("Silver") from Vinton, Texas, to other points throughout Texas and the United States. Silver purchases scrap steel rail from various railroads. The Santa Fe Railroad transports the rail to the Silver plant located on a Santa Fe rail siding in Vinton, Texas. There, Silver re-rolls the steel rail into rebar, and then Southern States transports the rebar to its destination.

During the period of transportation in question, Southern States possessed a certificate of convenience and necessity issued by the Interstate Commerce Commission ("ICC") authorizing Southern States to transport metal products in interstate commerce, including points in Texas. Appellee also had on file with the ICC a transit tariff containing a transit privilege applicable to shipments of steel rail via carriers from points in the United States to Vinton for fabrication into steel rebar. The transit privilege made available to appellee a through rate (a combination of the rail rate and the local Southern States rate) from the initial origin of the scrap rail via the transit point in Vinton to the final destination. Southern States did not, however, possess any intrastate motor carrier authority from the Texas Railroad Commission during the period of transportation. It is undisputed that the questioned portion of the transport performed by Southern States was made by motor-propelled vehicle transporting property for compensation over the public highways between two or more incorporated cities in Texas.

The State alleged that Southern States had performed for-hire motor carrier operations without first having obtained from the Railroad Commission the required certificate or permit authorizing such transportation. Tex.Rev.Civ.Stat.Ann. art. 911b § 3 (1964). Appellee answered by general denial and further asserted that, because the shipments were moving in interstate commerce, they were properly transported pursuant to the ICC certificate of convenience and necessity as well as the ICC transit tariff, and no Texas authorization was required. The trial court concluded that appellee's shipments were lawfully transported in interstate commerce pursuant to appellee's certificate of convenience and necessity issued by the ICC and appellee's transit tariff filed with the ICC. The court also determined that the shipments were not transported in violation of art. 911b.

In points of error two and three, appellant asserts that the trial court erred as a matter of law in holding that appellee's possession of an ICC certificate and transit tariff precluded a violation of art. 911b and

in holding that appellee's shipments constituted a portion of a continuous shipment in interstate commerce.

The trial court concluded, among other things, that the existence of a duly published and filed transit privilege under which shipments move is a strong indication of the through character of a movement and may have the effect of converting what would otherwise be an intrastate movement into interstate transportation by tying together separate transportation services into a single, through, interstate movement.[1] Further, the trial court concluded that the continuity of a through interstate movement traveling via the transit point under an appropriate transit privilege is not destroyed when the goods transported are processed or fabricated at the transit point or when the ultimate destination of the goods beyond the transit point is not known at the time the shipment originates.

Appellant specifically asserts under these points of error that the court should not have been influenced by the ICC permit and transit tariff and that the court erred by not applying the law of this state dealing with the application of an ICC transit tariff to shipments within Texas as announced in *Galveston Truck Lines v. State of Texas*, 123 S.W.2d 797 (Tex.Civ.App. 1938, writ ref'd.), *cert. denied* 308 U.S. 571, 60 S.Ct. 85, 84 L.Ed. 479 (1939). We agree and find *Galveston Truck Lines* to be controlling in this case.

In *Galveston Truck Lines*, the State brought an action against the truck line alleging that the motor carrier transported paint over Texas highways as a motor-freight carrier for hire without first securing a certificate or permit from the Railroad Commission. Galveston Truck Lines alleged that it was a contract-carrier engaged solely in the transportation of inter-state commerce which moved into Dallas, Texas by rail and moved out by appellant's auto freight line under transit arrangements published and filed with the ICC. *Id.* at 798.

In *Galveston Truck Lines*, the shipper shipped by railroad raw materials used for the manufacture of paint from sources outside Texas to Dallas and placed the materials in storage until they were used in the manufacturing process. The shipper also transported by railroad paint manufactured outside of Texas to Dallas where it was placed in a warehouse and commingled with products manufactured at Dallas. Forty percent of the commodities passing through Dallas were later sold to the consuming public through the manufacturer's subsidiary stores and sixty percent of the goods were later sold to the public through retail distributors. *Id.* at 799, 800.

The court in *Galveston Truck Lines* discussed and analyzed several elements under the facts of the case and concluded that when a transit privilege "creates a fictional through movement out of two separate movements, one of which might be interstate and the other intrastate, the fiction cannot be extended to the point of creating interstate commerce out of that which is essentially intrastate." *Id.* at 802. The same factors analyzed by the *Galveston Truck Lines* court apply to the movements of Southern States to establish that Southern States' two separate movements cannot be extended to the point of creating interstate commerce.

The first factor noted by the court was that at the time the raw materials for paint were shipped, the ultimate destination of the finished product was not known. It was known that the raw materials would be processed and manufactured at Dallas

---

1. The court found and it appears undisputed that a transit privilege is designed to benefit carrier and shipper by making available to the shipper a through rate from the origin to final destination via the transit point, to capture traffic for the carrier publishing the transit privilege, and to enhance shippers' ability to compete in distant markets by achieving transportation cost economies. A "transit" is a stop-over privilege on a continuous journey granted by a carrier by which a break de facto in the continuity of the carriage of goods is disregarded, and the two legs of a journey are treated as though they were covered without interruption; it unites both legs into a through route for which a joint rate can be published. *Galveston Truck Line Corporation v. State*, 123 S.W.2d 797, 802 (Tex. Civ.App.1938, writ ref'd.), *cert. denied*, 308 U.S. 571, 60 S.Ct. 85, 84 L.Ed. 479 (1939).

into finished commodities, stored and shipped to the subsidiary stores or to privately owned retail distributors for sale to the consuming public. *Id.* at 799, 800, 802. Similarly here, the court found that at the time inbound rail shipments of scrap steel rail are received by Silver at Vinton, Texas, such rail has no particular beyond destination (other than with respect to back orders which may be on hand for steel rebar).

Second, the court in *Galveston Truck Lines* noted that all products manufactured outside Texas and stored in Dallas along with all materials and finished products in the possession of subsidiaries were rendered for taxation. *Id.* at 800, 802. By the same token, Silver pays state taxes on its inventory of steel rail and rebar.

Third, in *Galveston Truck Lines,* the paint raw materials were shipped to Dallas under contracts or bills of lading entered into with the railroad company and the shipments from Dallas to other points in Texas were under new and separate contracts of transportation by different mode of transportation (truck instead of rail). *Id.* at 800, 802. Correspondingly, in this situation, Silver purchased all of the steel rail from railroads in the western United States and all of the steel rail moves into Vinton, Texas, via rail through New Mexico. The western railroads transport the steel rail to a point on the line of the Santa Fe Railroad, and Silver is responsible for payment of a transportation charge to Santa Fe for further delivery to Vinton. From February through October 1983, Southern States transported the shipments of steel rebar for Silver (which is an affiliated company) to various consignees located in other Texas cities. These shipments were made by motor-propelled vehicle transporting property for compensation over the public highways between two or more incorporated cities in Texas.

A fourth significant factor found by the court in *Galveston Truck Lines* was that the original shipments were delivered to the paint manufacturer at Dallas, Texas, for its own purposes, and the manufacturer retained exclusive control of the same. *Id.* at 802. Likewise, in this instance, scrap steel rail delivered by the western railroads to Silver during the period in issue was relinquished by the railroads into Silver's possession for re-rolling into steel rebar. The rebar was not stored prior to further transportation from Vinton at any facility under the control of appellee.

Fifth, the fact that the raw material shipped to Dallas was manufactured and processed into finished products was also noted by the court in *Galveston Truck Lines.* *Id.* at 800. In like manner, the general manager for appellee, who purchased raw materials for Silver, indicated that the scrap rail was manufactured and processed into a finished product, stored and inventoried by Silver. In fact, he testified that the rail is heated to a softening point and then converted from rail into rebar, and then shipped to various customers.

Southern States asserts the proposition that crucial to the determination of the essential character of a shipment is the fixed and persistent intent of the shipper, or others for whose benefit the shipment is made at the time of shipment. Appellee cites several federal and ICC cases for this proposition. *See Baltimore and O.S.W. Railroad Co. v. Settle,* 260 U.S. 166, 43 S.Ct. 28, 67 L.Ed. 189 (1922); *Seaboard Air Line Railway Co. v. Lee,* 14 F.2d 439, 442 (E.D.N.C.1926), *aff'd per curiam,* 276 U.S. 591, 48 S.Ct. 211, 72 L.Ed. 720 (1928); Armstrong, Inc.—Transportation within Texas, 2 I.C.C.2d 63, 69 (1986); Iron and Steel Articles from Wilmington, N.C., 323 I.C.C. 740, 742 (1965); *aff'd North Carolina Utilities Commission v. United States,* 253 F.Supp. 930 (E.D.N.C.1966). Indeed, the intention of the shipper is an important factor in determining the character of the transportation beyond the point of transit. *Galveston Truck Lines,* 123 S.W.2d at 801–802. In fact, a transit tariff such as that held by appellee is itself evidence of an intention on the part of the shipper to continue the interstate journey to a point beyond the transit point within the period provided in the transit tariff. *Id.* at 801. However, as pointed out by the Texas court in *Galveston Truck Lines:*

Mere intention by the owner ultimately to ship the finished products manufactured and processed in Texas from raw materials shipped from out of the state does not put them in interstate commerce. The character of the shipment in such a case depends on all the evidential circumstances, looking to what the owner has done in carrying out the journey.

*Id.* at 800–801.

After analyzing the trial court's findings of fact and the evidence, along with the criteria set out in *Galveston Truck Lines,* we believe that the interstate movement ceased at Vinton, Texas, that subsequent shipments to points within the state constituted intrastate movements and that the trial court erred as a matter of law in not finding that appellee violated the Motor Carriers Act. Appellant's points of error two and three are sustained, and we find it unnecessary to address the remaining assertions of error.

We conclude that Southern States violated Tex.Rev.Civ.Stat.Ann. art. 911b. We reverse the judgment and remand to the trial court for entry of judgment consistent with our opinion.