**SOUTHERN STATES TRANSPORTATION, INC., Petitioner,**

v.

**The STATE of Texas, Respondent.**

**No. C–8050.**

Supreme Court of Texas.

May 24, 1989.

Rehearing Denied Sept. 13, 1989.

James M. Doherty, Austin, for petitioner.

Jim Mattox, Robert Ozer, Douglas Fraser, Anne E. Swenson, Austin, for respondent.

MAUZY, Justice.

The issue in this case is whether Southern States Transportation, Inc. engaged in intrastate motor carrier operations without a permit from the Texas Railroad Commission in violation of the Texas Motor Carrier Act, Tex.Rev.Civ.Stat.Ann. art. 911b (Vernon 1964 & Supp.1989). The State of Texas sued Southern States for penalties and an injunction under section 16(b) and (c) of the Act. After a bench trial, the district court found that Southern States' shipments which were the object of the State's complaint were made in interstate commerce, not intrastate commerce, under a certificate of convenience and necessity issued to Southern States by the Interstate Commerce Commission. Accordingly, the district court concluded that Southern States had not violated the Act, and rendered judgment that the State take nothing against Southern States. The court of appeals reversed, holding as a matter of law that Southern States had engaged in intrastate motor carrier operations in violation of the Act. *756 S.W.2d 98.* The court of appeals remanded the case to the district court for entry of judgment against Southern States. We hold that whether Southern States's shipments were in interstate or intrastate commerce is a question of fact, not a matter of law, and that there is evidence to support the district court's findings. Accordingly, we reverse the judgment of the court of appeals and affirm the judgment of the district court.

The court of appeals reviewed the evidence and the district court's findings and concluded as a matter of law that the shipments at issue occurred in intrastate commerce. The court of appeals could reach this conclusion only by determining that there was no probative evidence to support the district court's findings that the shipments were in interstate commerce. *See Ray v. Farmers' State Bank,* 576 S.W.2d 607, 609 (Tex.1979). In making this determination the court of appeals was required to consider only the evidence favorable to the trial court's findings and judgment, and to disregard all evidence to the contrary. *Id.* The court of appeals did not purport to perform this analysis, but simply stated its disagreement with the district court. The court of appeals was not, of course, authorized simply to substitute its assessment of the evidence in this case for that of the district court. *Id.* If the district court's findings are supported by probative evidence, then the court of appeals could not disregard them as a matter of law.

The evidence most favorable to the district court's findings is that W. Silver, Inc. purchased scrap steel rail from railroads, had it delivered from various points inside and outside the state to its plant in Vinton, Texas, re-rolled the steel rail there into rebar, and then shipped via Southern States' trucks to various destinations inside the state. Southern States operated under a certificate of convenience and necessity issued by the Interstate Commerce Commission, and a transit privilege on file with the Commission.

 Whether transportation between points in a single state is interstate or

intrastate in nature, "the essential character of the commerce, not its mere accidents, should determine." *Texas & New Orleans Railroad Co. v. Sabine Tram Co.*, 227 U.S. 111, 126, 33 S.Ct. 229, 234, 57 L.Ed. 442 (1913). Crucial to this determination is the fixed and persisting intent of the shipper, or others for whose benefit the shipment is made, at the time of the shipment. *Baltimore & Ohio Southwestern Railroad Co. v. Settle*, 260 U.S. 166, 174, 43 S.Ct. 28, 31, 67 L.Ed. 189 (1922); *Texas v. United States*, 866 F.2d 1546, 1556 (5th Cir.1989). In this case there was probative evidence that W. Silver's intent was to import scrap steel rail from outside Texas, store it temporarily in Vinton while it was being re-rolled, and then continue it on to its ultimate destinations in Texas. There was substantial evidence from which the district court could have concluded that the movement of the steel through Vinton and from there to other cities in Texas was part of its continuous and essentially uninterrupted journey in interstate commerce. Southern States' operation under an ICC transit privilege was also strong evidence that its shipments for W. Silver were in interstate commerce. *See Settle*, 260 U.S. at 171, 43 S.Ct. at 30–31; *Texas*, 866 F.2d at 1557.

The court of appeals and the State rely heavily on *Galveston Truck Line Corp. v. State*, 123 S.W.2d 797 (Tex.Civ.App.—Dallas 1938, writ ref'd), *cert. denied*, 308 U.S. 571, 60 S.Ct. 85, 84 L.Ed. 479 (1939). In that case, the district court found that the shipments in question were in intrastate commerce, and the court of appeals affirmed. In the present case, the court of appeals points out the many similarities between the facts in *Galveston Truck Line* and the facts here. From these similarities the court of appeals reasons that the shipments in the present case, like those in *Galveston Truck Line*, must have been intrastate in character. The logic of this reasoning is flawed. The fact that the

evidence in one case will support a finding of intrastate commerce does not mean that evidence in another case, however similar, will not support a finding of interstate commerce. Indeed, the court in *Galveston Truck Line* stated:

> The character of the shipment in such a case depends upon all the evidential circumstances, looking to what the owner has done in carrying out the journey.

123 S.W.2d at 801.

Because the essential character of commerce determines its characterization as interstate or intrastate, and the intent of the shipper is crucial to this determination, the nature of any given shipments depends entirely upon the facts and circumstances surrounding those shipments. The determination is thus ordinarily one for the finder of fact, in this case, the district court. If there is sufficient evidence to support the fact finder's determination, it is conclusive. In the present case, as in most such cases, the evidence was conflicting. Southern States' shipments were certainly not intrastate as a matter of law. Consequently, the court of appeals erred in reversing the district court and directing that judgment be rendered in favor of the State.

The State raised additional points of error in the court of appeals which that court did not address. Each of those points complains that the trial court erred as a matter of law in refusing to hold or find facts against Southern States.[1] With respect to each such point, either the issue is inconsequential to the trial court's conclusion, or the evidence was conflicting and therefore a matter of fact for the trial court to resolve. We have carefully reviewed these points and determined that they are without merit. There is thus no reason to remand the case to the court of appeals for further consideration of those points. We therefore reverse the judgment of the court of appeals and affirm the judgment of the district court.

---

1. Specifically, the State complained that the trial court erred as a matter of law in holding that Southern States did not violate the Texas Motor Carrier Act, in refusing to hold that the railroads which transported the scrap steel rail to Vinton were the original shippers of the material and were private carriers as to that material, and in refusing to find that the railroads did not intend that the scrap rail be shipped past Vinton and that movement by private carriage is not subject to ICC jurisdiction.

GONZALEZ, J., files a dissenting opinion in which HIGHTOWER, J., joins.

GONZALEZ, Justice, dissenting.

I am concerned that the court's opinion will create uncertainty and confusion in this area of the law and am surprised that the court has reversed the judgment of the court of appeals on a theory not argued, briefed, or preserved by the parties. I would hold that the court of appeals correctly decided the case as a matter of law and I would therefore affirm its judgment.

The Interstate Commerce Commission (ICC) regulates motor carriers that transport property in interstate commerce, however, the states retain authority to regulate intrastate transportation provided by motor carriers within their respective borders. *See* 49 U.S.C. § 10521(b)(1). The key question presented here is whether an interstate commerce shipment of scrap rail retains its interstate commerce character when there is no intent at the time the rail is shipped from its out-of-state origins to Texas for the shipment to continue to particular locations beyond its original destination in Texas.

The facts are relatively simple and undisputed. W. Silver, Inc. (Silver) bought scrap steel rail from several railroads in the United States. The railroads delivered the rail to Silver's plant in Vinton, Texas where the rail was melted and processed into a commodity called "rebar." Southern States Transportation, Inc. (Southern) then transported the rebar by truck from Vinton to various locations in the country including various Texas locations. It is the subsequent shipments from Vinton which occurred wholly within the State without a Texas Railroad Commission permit that are at issue here.

The State brought this action against Southern for failure to obtain the permits required under the Texas Motor Carriers Act, Tex.Rev.Civ.Stat.Ann. art. 911b § 3 (Vernon 1964). The Act requires motor carriers to obtain a permit or certificate of public convenience and necessity from the Texas Railroad Commission if they transport property for compensation or hire over public highways of the State between two or more incorporated cities, towns, or villages. Failure to obtain such permits can result in misdemeanor conviction, fines, and/or an injunction against further violations. Tex.Rev.Civ.Stat.Ann. art. 911b § 16 (Vernon Supp.1989).

At trial and on appeal, Southern defended the suit on the basis that the shipment of rebar in Texas was a continuous shipment, moving in interstate commerce. Thus, Southern contended that it was not subject to state regulation. After a nonjury trial, the trial court agreed and rendered judgment for Southern. From the trial court's findings of fact and conclusions of law, it is obvious that the trial court decided the issue as a matter of law. The court of appeals, relying on *Galveston Truck Line Corp. v. State*, 123 S.W.2d 797 (Tex.Civ.App.—Dallas 1938, writ ref'd) *cert. denied*, 308 U.S. 571, 60 S.Ct. 85, 84 L.Ed. 479 (1939), held that interstate movement ceased at Vinton, Texas. It thus reversed the judgment of the trial court and held that as a matter of law, the shipments in question were intrastate shipments and that the trial court erred in not finding that Southern had violated the Texas Motor Carrier Act. This court now reverses the court of appeals on a theory that was not argued or briefed by Southern. I disagree with this disposition and would hold that the court of appeals correctly decided the case.

In *Galveston,* the State brought an action against a truck line alleging that it transported paint over state highways from Dallas to other Texas locations as a motor carrier for hire without first securing a permit from the Railroad Commission. *Id.* at 798. The truck line argued that the shipments of paint consisted wholly of interstate commerce which moved into Dallas by rail and moved out of Dallas by motor carrier under transit arrangements published and filed with the ICC. Thus, like the present case, the key question in *Galveston* was whether the shipments constituted interstate or intrastate commerce.

The shipper in *Galveston* had shipped raw materials to be used in the manufac-

ture of paint to Dallas from sources outside Texas. The materials were placed in storage until they were needed in the manufacturing process. The shipper had also transported paint manufactured outside Texas to Dallas where it was placed in a warehouse and commingled with the paint manufactured in Dallas. In reaching its conclusion that the shipments of paint from Dallas to other Texas locations were in intrastate commerce, the court in *Galveston* addressed several factors which are applicable to the facts of the present case.

The first factor was that at the time the raw materials for the paint were initially shipped to Dallas, the ultimate destination of the finished paint product was not known. Similarly, in this case, when the inbound shipments of scrap steel rail were received by Silver in Vinton, they had no particular known destination.[1]

Second, the raw materials and finished products in *Galveston* were rendered for taxation in Texas by the shipper. Likewise, Silver paid state taxes on its inventory of scrap steel rail and rebar.

Third, in *Galveston*, the reshipments from Dallas to other Texas destinations were under new and separate contracts of transportation by a different mode of transportation. Correspondingly, Silver received shipments of scrap steel rail from railroads via rail. After processing, South-ern, under a separate contract, transported the rebar by truck from Vinton to other Texas cities.

The *Galveston* court also placed some emphasis on the fact that the raw materials shipped to Dallas were processed into finished paint products in Dallas under the exclusive control of the paint manufacturer. Similarly, in the present case, the railroads relinquished their rights in the scrap steel rail to Silver in Vinton. Under Silver's exclusive control, the rail was heated to a softening point and then converted into rebar.

In the trial court, the court of appeals, and in its brief and oral argument before us, Southern placed great importance and emphasis on the fact that it possessed an ICC permit. Southern asserted that this somehow exempted it from being regulated by the Texas Railroad Commission for shipments wholly within the State. I disagree. Once the railroads delivered the rail to Silver's plant in Vinton, the railroads' task was complete. The State of Texas had and continues to have the authority to regulate subsequent shipments of the rebar within the State. Southern should not be permitted to "kite" or "piggyback" its ICC permit in order to circumvent state law.[2] No amount of subterfuge or legal mumbo jumbo will convert these shipments from intrastate commerce to interstate commerce.

---

1. The majority opinion misstates the facts when it states that it was Silver's intent "to import scrap metal rail from outside Texas, store it temporarily in Vinton while it was being re-rolled, *and then continue it on to its ultimate destinations in Texas."* (emphasis added). Southern's witness, Cornelius Hoffmans, testified as follows during cross-examination by the State:

> Q Isn't it true that the rail was shipped to W. Silver and held by W. Silver for its own purposes?
> A Yes, sir.
> Q And isn't it true that the rail was manufactured and processed into a finished product, stored and inventoried by W. Silver?
> A Yes, sir.
> Q Isn't it true that when the rail came to W. Silver's plant, it had no particular destination at the time it was received?
> A Other than back-orders, that's correct.
> Q Isn't it true that W. Silver retained exclusive control of the shipments of rail after it

received it, and of the outbound rebar? Well, when you got—
> A Until it's given to a carrier?
> Q When you got the rail, it was yours to keep, was it not?
> A Yes, sir.
> Q And you exercised exclusive control over it at that point, did you not?
> A Yes.
> Q And you also exercised complete control over the outbound rebar before it's shipped out, did you not?
> A Yes, sir.

This conclusively shows that the shipments in question were not continuous interstate commerce shipments. They lost their interstate character in Vinton.

2. All of the shares of Southern and Silver are owned by the same persons and a witness for Southern conceded at trial that Southern was created in order to avoid paying state freight charges.

Also, I think that it is ill-advised for the court to hold that in every instance the issue of whether a shipment is in interstate or intrastate commerce is a question of fact. This will yield different results on identical facts and will create havoc on the State's efforts to regulate intrastate commerce. For all of these reasons, I would affirm the judgment of the court of appeals.

HIGHTOWER, J., joins this opinion.