Anchor v. Gulfwest 



TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-94-00539-CV







Anchor Operating Company, Appellant



v.



Gulfwest Drilling Company, Appellee







FROM THE DISTRICT COURT OF FAYETTE COUNTY, 155TH JUDICIAL DISTRICT


NO. 92V-211, HONORABLE DAN R. BECK, JUDGE PRESIDING







PER CURIAM


 This appeal concerns a disputed drilling contract. Appellee Gulfwest Drilling
Company contracted to drill a series of oil wells for appellant Anchor Operating Company, the
operator of the lease. Gulfwest drilled two wells, but was unable to complete a third, the Voss
#1 well. Because damage to the Voss #1 well rendered it unusable, each side sued the other in
separate lawsuits: Anchor claimed breach of the drilling contract, and Gulfwest sought a
declaratory judgment as well as amounts due for services performed under the contract. The trial
court consolidated the two suits into one, which was tried to a jury. Following the jury's verdict
in favor of Gulfwest, the court rendered judgment on the verdict. We will affirm the judgment
of the trial court.

 In its first point of error, Anchor attacks the amount of damages Gulfwest
recovered. The trial court submitted the case to the jury on the theory that the damage to the Voss
#1 well and the subsequent inability to complete it were caused by the failure of the casing in the
well. The jury found that the casing failure was not caused by Gulfwest's operations. The jury
then awarded Gulfwest $164,485.46 as the amount due under the contract. The court rendered
judgment for the same amount. Anchor argues that this amount was not based on the formula set
out in the drilling contract and that the evidence is both legally and factually insufficient to support
the amount of damages. Anchor does not challenge the court's theory of submission that the
casing failure damaged the well.

 To review Anchor's no-evidence challenge, we consider only the evidence and
inferences tending to support the finding. If any probative evidence supports the finding, it must
be upheld. Responsive Terminal Sys., Inc. v. Boy Scouts of Am., 774 S.W.2d 666, 668 (Tex.
1989); Southern States Transp., Inc. v. State, 774 S.W.2d 639, 640 (Tex. 1989). To review
Anchor's factual-sufficiency challenge, we consider all the evidence and will set aside the finding
only if the evidence supporting it is so weak, or the evidence to the contrary so overwhelming,
as to make it clearly wrong and unjust. Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986); West
v. Watkins, 594 S.W.2d 800, 802 (Tex. Civ. App.--San Antonio 1980, writ ref'd n.r.e.).

 The drilling agreement between the parties is on a preprinted form contract
promulgated by the International Association of Drilling Contractors, titled "Drilling Bid Proposal
and Footage Contract - U.S." Anchor and Gulfwest altered certain terms of the form contract by
lining through its language and inserting their own.

 In arguing that damages were incorrectly calculated, Anchor relies on article 6.3(c)
of the contract, which carries the heading "Early Termination Compensation." Article 6.3(c)
states: 


Subsequent to Spudding: If such work stoppage occurs by or through the fault of
Operator after the spudding of the well, Operator shall pay the Contractor the
lesser of (1) the amount owing Contractor at the time of such work stoppage under
the footage rate, or (2) the applicable daywork rate, and standby rate; but in such
event Operator shall pay Contractor for a minimum footage of 1,300 feet
regardless of whether or not the well has been drilled to such depth at the time of
work stoppage.



 Article 6.3(c), however, is a subpart of article 6, titled "Stoppage of Work by
Operator or Contractor." Articles 6.1 and 6.2 of article 6 permit the operator and the contractor
to order drilling to stop before the well is completed under stated conditions. See Owen L.
Anderson, The Anatomy of an Oil and Gas Drilling Contract, 25 Tulsa L.J. 400-02 (1990). The
contractor's right to terminate the contract is narrowly drawn, limited to the events of force
majeure, total loss of the drilling rig, the operator's failure to pay timely, and the operator's
financial impairment. The operator, by contrast, can order the contractor to stop work at any
time, even though the contractor has made no default under the contract. See id.

 Should either the operator or the contractor order drilling to cease as permitted,
articles 6.1 and 6.2 specify that the compensation due the non-terminating party is that set out in
article 6.3. Article 6.3 contains three sections that tailor the compensation to the timing of the
order to cease operations: (a) before operations have commenced, (b) after commencement but
before spudding, and (c) after spudding.

 The drilling contract further provides that Gulfwest will be compensated for drilling
each well based on the number of feet drilled, but that for certain other operations it will be
compensated a fixed amount each day. The evidence shows that, after Gulfwest determined that
the casing had parted and notified Anchor that it was switching to the dayrate portion of the
contract, Gulfwest's president, Charles Major, talked to Anchor's president, Alfred Pampell, in
Pampell's office. The two disagreed over who was responsible for the drilling problems,
following which Major told Pampell that Gulfwest would cease operations, secure the well, and
move the rig off the wellsite. Gulfwest's determination to discontinue operations due to the casing
failure was not authorized by article 6.2. Neither were operations discontinued at Anchor's order
pursuant to article 6.1. Therefore, article 6.3(c), governing compensation when either the
operator or the contractor terminates the contract under article 6, does not apply to this case.

 The facts of this case instead invoke article 18 of the contract, titled "Responsibility
for Loss or Damage." Article 18.6, which applies when operations are occurring on a footage
basis, provides:



If the hole is lost or damaged as a result of the failure of Operator's casing or
equipment either during or after the running and setting of such casing, or as a
result of subsequent failure of the cementing job resulting in parted casing, such
loss shall be borne by Operator and Contractor shall nevertheless be paid: (a) For
all footage drilled and other work performed by Contractor prior thereto; (b) For
work performed in an effort to restore the hole to such condition as that further
drilling or other operations may be commenced at the applicable daywork rate; and
(c) . . . . (1)



 Under the contract, Anchor was responsible for furnishing the casing and cement
for the Voss #1 well. Anchor does not dispute the fact that the casing in the Voss #1 well failed. 
The evidence shows that this failure occurred while operations were being conducted on the
footage portion of the contract.

 One purpose the drilling contract serves is to allocate the risks each party
undertakes in drilling a well. Id. at 398. The contract the parties executed here unambiguously
allocates the risk of loss due to casing failure to Anchor. The contract was admitted in evidence
and was available to the jury for examination. We therefore conclude that, because the casing
failed, the parties' obligations are governed by article 18.6 of the contract. This article affords
Gulfwest as contractor compensation for all footage drilled in addition to all daywork performed
in an effort to restore the hole for further drilling.

 The contract provides that for work performed on a footage basis, the contractor
will be paid $10.00 per foot drilled. The contract also authorizes a daywork rate for all work the
contractor performs in an effort to restore the hole if damage results from the failure of the
operator's casing. The contract provides that the contractor will be paid $4,400.00 per day for
work performed on a daywork basis.

 Major testified, without contradiction, that after the drilling bit encountered an
obstruction in the hole, Gulfwest authorized tests to correct the blockage. Once Gulfwest
determined that the casing had parted, it informed Anchor that it was switching to the daywork
portion of the contract and continued conducting tests to resolve the problem. The trial court
admitted in evidence Gulfwest's statement of account showing the amounts due on each of the
three wells drilled under the contract. Major testified that Gulfwest's vice-president of finance
compiled the statement by reviewing and listing all invoices sent to Anchor, then subtracting any
payments received. Major stated, again without contradiction, that the statement shows that
Gulfwest billed for the Voss #1 well at the footage rate for the depth actually drilled, 9,870 feet,
and at the daywork rate for the remainder. The statement also includes "rebillable" amounts that
appear to be sums Gulfwest paid third parties to conduct certain tests on the well after the casing
failed.

 The statement shows that $150,372.28 was due on the Voss #1 well and that
$164,485.46 was due on the three wells combined. Because this evidence supports the jury's
award by legally and factually sufficient evidence, we overrule point one.

 In its second point of error, Anchor complains that the trial court erroneously
excluded the testimony of Neil Milam. Milam would have testified that he supervised Gulfwest's
crew drilling the Voss #1 well and that some of the drill pipe put into the well was bent or
crooked. The court excluded Milam's testimony on the basis that Anchor designated him as a
witness late and failed to show good cause for admitting his testimony.

 If not timely disclosed in response to a request, a witness cannot testify, and the
sanction is automatic. Tex. R. Civ. P. 215(5); Alvarado v. Farah Mfg. Co., 830 S.W.2d 911,
914 (Tex. 1994). In interrogatories to Anchor, Gulfwest requested the names of all fact and
expert witnesses. The transcript contains the trial court's order extending its previous discovery
deadline to May 11, 1994. Anchor designated Milam as a both a fact and an expert witness in
supplemental answers that it served on Gulfwest on May 19 and filed with the trial court on May
20. Trial began in this case on May 23, 1994.

 The testimony of the undisclosed witness is admissible only if the trial court finds
that good cause exists to admit it. Tex. R. Civ. P. 215(5). The burden of establishing good cause
is on the party offering the evidence, and good cause for admission must be shown in the record. 
Id. In support of good cause, Anchor made the following arguments in the trial court and on
appeal: Gulfwest knew which employees were working on the Voss #1 well; Anchor would offer
Milam only on rebuttal; Anchor designated Milam as soon as it learned of his identity; and
Anchor could not have anticipated Gulfwest's denial that it used crooked drill pipe.

 The party offering the undisclosed witness' testimony must supply documentary or
testimonial proof, as opposed to argument of counsel, to sustain its burden of showing good cause. 
Satterwhite v. Safeco Land Title, 853 S.W.2d 202, (Tex. App.--Fort Worth 1993, writ denied);
Lopez v. Foremost Paving, Inc., 796 S.W.2d 473, 477 (Tex. App.--San Antonio 1990, writ
dism'd). Anchor's argument that it did not know of Milam's identity sooner required evidence
that it made good faith efforts to identify him. See Clark v. Trailways, Inc., 774 S.W.2d 644, 747
(Tex. 1989); see also Alvarado, 830 S.W.2d at 914 (good-cause exception permits trial court to
excuse a failure to comply with discovery in difficult or impossible circumstances). Anchor failed
to support any of its arguments on good cause with proof.

 Moreover, nothing in the record supports Anchor's assertion that it could not have
foreseen Gulfwest's denial that it used crooked drill pipe. Anchor itself alleged that Gulfwest's
defective drill pipe caused the problems in the Voss #1 well. Gulfwest generally denied this
allegation, thereby putting the burden of proof on Anchor. Pampell, in his deposition on April
28, 1994, specifically mentioned crooked drill pipe as a cause of the casing problems. The trial
court was within its discretion in determining that Anchor failed to demonstrate that it could not
have anticipated needing Milam's testimony. Compare Gannett Outdoor Co. v. Kubeczka, 710
S.W.2d 79, 84 (Tex. App.--Houston [14th Dist.] 1986, no writ) (admission of testimony could not
have been anticipated before unexpected false testimony of opponent's witness).

 Anchor's remaining arguments, even if proved, have been held not to constitute
good cause to admit testimony. Alvarado, 830 S.W.2d at 914; Sharp v. Broadway Nat'l Bank,
784 S.W.2d 669, 671 (Tex. 1990). Because we conclude that the trial court did not abuse its
discretion in excluding Milam's testimony, we overrule point two.

 We affirm the judgment of the trial court.


Before Chief Justice Carroll, Justices Aboussie and Jones

Affirmed

Filed: August 30, 1995

Do Not Publish

1.   Section (c) does not apply to the situation here.