TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-97-00411-CV






Joe and Sue Shell, Appellants



v.



Austin Rehearsal Complex, Inc., Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT


NO. 95-15667, HONORABLE W. JEANNE MEURER, JUDGE PRESIDING 







 Appellee Austin Rehearsal Complex, Inc. ("ARC") filed suit against appellants Joe
and Sue Shell seeking declaratory relief, damages, and specific performance concerning its
asserted right of first refusal to lease additional space in a building owned by the Shells. After
partial summary judgment favorable to ARC and a jury trial resulting in findings favorable to
ARC, the trial court rendered final judgment granting ARC declaratory relief and ordering that
ARC recover from the Shells $110,000 in lost profits and more than $118,000 in attorney's fees.

 The Shells appeal asserting ten points of error. The issues raised concern: whether
ARC still held a right of first refusal at the time of the dispute; whether ARC could use its own
trade name and operate its rehearsal room business in space it acquired by exercising its option;
whether certain evidence gathered and presented to the jury violated the attorney-client privilege;
whether the trial court erred in excluding evidence of events surrounding a previous default
judgment ARC had obtained against the Shells; whether ARC effectively exercised its right of first
refusal; whether the evidence is sufficient to support the jury verdict; and whether ARC's
rehearsal room business violates the prohibition on subleasing in ARC's lease. We will affirm
the trial court's judgment.


FACTUAL AND PROCEDURAL BACKGROUND


 ARC is in the business of operating music rehearsal rooms. In 1989, ARC entered
into a lease with Entertainment Complex, Inc. for space in a building located at 1109 to 1115
South Congress Avenue in Austin (the "Building"). The Building is a two-story structure with
the upper level fronting South Congress Avenue and the downstairs accessible only from behind
the Building, which sits on a hill sloping downward away from the street. ARC leased space in
the lower, basement-like level. Anticipating expansion, ARC negotiated into its lease (the
"Lease") a right of first refusal on sales and leases of space that became available in the Building. (1)

 In 1990, Entertainment Complex, Inc. transferred ownership of the Building to
Terrace Motor Hotel, Inc. ("Terrace"), which took the property subject to the Lease. In 1993,
Terrace sold the Building to Joe and Sue Shell.

 During 1993 and 1994, the Shells leased space in the Building to various tenants. 
The Shells sent ARC a "notice of offer" concerning each of these leases, as required by ARC's
original lease, but ARC did not exercise its right to lease any of these spaces. By September
1995, ARC had notified the Shells that it was now in the position to expand its business and
desired to lease space when it became available. During that month, the Shells sent a notice of
offer to ARC for the space at 1111 South Congress. This notice set out more specific terms of
the proposed lease than had earlier notices of offer, terms that ARC claims would have prevented
it from using the space for music rehearsal rooms. ARC did not exercise its option as to 1111
South Congress before its option elapsed, and the Shells leased the space to another tenant.

 In December 1995, the space at 1109 South Congress became available. Again the
Shells sent a notice of offer to ARC with the long list of specific terms and conditions. This time,
ARC contends that, although it exercised its option and accepted the offer, the Shells refused to
lease the space to them. The Shells argue that ARC did not effectually exercise its option because
ARC's acceptance of the notice of offer was conditional. ARC filed suit against the Shells seeking
specific performance, damages, and declaratory relief. After several orders granting partial
summary judgment for ARC and a jury trial that resulted in a verdict favoring ARC, the trial
court rendered a final judgment in ARC's favor for lost-profit damages of $110,000, attorney's
fees of $118,601 (more if the Shells appealed unsuccessfully), and declaratory relief. The Shells
raise ten points of error on appeal.


DISCUSSION

Right of First Refusal

 In their first and third points of error, the Shells assert that the trial court erred in
denying their motion for partial summary judgment on May 15, 1996 and in granting partial
summary judgments for ARC on May 22 and October 30, 1996. (2) In granting partial summary
judgment for ARC, the trial court declared that ARC had continuing rights of first refusal for
purchases and leases of space in the Building. The standards for reviewing a motion for summary
judgment are well established: (1) the movant for summary judgment has the burden of showing
that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law;
(2) in deciding whether there is a disputed material fact issue precluding summary judgment,
evidence favorable to the nonmovant will be taken as true; and (3) every reasonable inference
must be indulged in favor of the nonmovant and any doubts resolved in its favor. Nixon v. Mr.
Property Management Co., 690 S.W.2d 546, 548-49 (Tex. 1985). When both parties move for
summary judgment and one motion is granted and the other is overruled, the appellate court
should consider all questions presented to the trial court, including whether the losing party's
motion should have been overruled. Jones v. Strauss, 745 S.W.2d 898, 900 (Tex. 1988). Each
party must carry its own burden as the movant and, in response to the other party's motion, as
the nonmovant. James v. Hitchcock Indep. Sch. Dist., 742 S.W.2d 701, 703 (Tex. App.--Houston
[1st Dist.] 1987, writ denied).

 The Shells first assert that when the Building was transferred from Entertainment
Complex, Inc. to Terrace in 1990, ARC's right of first refusal was extinguished. ARC responds
that under the terms of the Lease the transfer was not a "sale" that would nullify ARC's right of
first refusal because both Entertainment and Terrace were owned by Clark Lyda and his family,
so Terrace was not "a party unaffiliated with Lessor" as required in the Lease. In any event,
ARC points out that the Shells' argument that ARC's rights were extinguished by this transfer was
not presented to the trial court. Issues not expressly set out in the motion, answer, or other
response shall not be considered on appeal as grounds for reversal. Tex. R. Civ. P. 166a(c). The
argument is not preserved for review.

 The main issue here is whether ARC still had a right of first refusal for leases of
spaces in the Building after the Shells purchased the Building from Terrace in 1993. Paragraph
21 of the Lease grants to ARC rights of first refusal on future leases or sales of space in the
Building. However, the Lease states that if the leased premises are sold, the third-party purchaser
takes the premises free from any right of refusal of ARC. ARC asserts that, before the Building
was sold to the Shells, ARC and Terrace executed an addendum (the "Addendum") to the Lease
modifying paragraph 21 to preserve ARC's right of first refusal. In part, the Addendum states:


ARC hereby waives its right of first refusal under Paragraph 21 of the Lease, but
only for the purchase by Joe and Sue Shell and only if Joe and Sue Shell complete
the purchase of 1109 South Congress by November 30, 1993. Paragraph 21 of
the lease shall remain in full force an [sic] effect for any future sales of 1109
South Congress.


 The primary concern in construing a written contract is to ascertain the true intent
of the parties as expressed in the instrument. National Union Fire Ins. Co. v. CBI Indus., Inc.,
907 S.W.2d 517, 520 (Tex. 1995). If the contract can be given a definite or certain legal
meaning, it is not ambiguous. Id. If, however, the contract is subject to two or more reasonable
interpretations, it is ambiguous. Id. The court determines whether a contract is ambiguous by
looking at the contract as a whole in light of the surrounding circumstances in which the contract
was entered. Id. Only after a contract is determined to be ambiguous may the court consider
parol evidence, the parties' interpretations, and other extrinsic evidence to construe the language
in question. Id; see also Sidelnik v. American States Ins. Co., 914 S.W.2d 689, 691 (Tex.
App.--Austin 1996, writ denied).

 In examining the circumstances surrounding ARC's execution of the Addendum,
we note that, as required under the Lease, Terrace had given a notice of offer to ARC concerning
the Shells' interest in purchasing the Building. Under the Lease, if ARC did not exercise the
option, its option would not survive the sale of the Building. The language of the Addendum is
clearly an effort to preserve ARC's rights under Paragraph 21, i.e., the rights of first refusal as
to sales or leases of Building space. The whole of the Addendum is an agreement to make various
changes to the Lease between ARC and Terrace. Under parts of the Addendum not quoted above,
the parties agreed to amend paragraphs 20 and 13. The parties further agreed that ARC would
be allowed to pay half of each month's rent by the third day of the month and the other half by
the twelfth day of that month.

 The section quoted above had two effects. In the first sentence of the above-quoted
section, ARC waived its right to purchase the Building at that time. The second sentence amended
paragraph 21 of the Lease so that ARC's rights under that paragraph (i.e., the rights of first
refusal as to sales and leases of Building space) would not be extinguished by the contemplated
sale of the Building to the Shells. In another section of the Addendum, Terrace acknowledged
that ARC was current on its rent payments. In light of the whole of the Addendum and the
surrounding circumstances, we conclude that the above-quoted section of the Addendum is not
ambiguous. The Addendum amended the Lease so that ARC's right of first refusal was not
extinguished by the sale to the Shells.

 The Shells contend that the date on which the Addendum was executed remains a
disputed issue of material fact. The Shells closed on the purchase of the Building on July 2, 1993. 
There is evidence that at least two copies of the Addendum were executed. One copy was signed
by Don Harvey, president of ARC, and Clark Lyda, president of Terrace. The other copy of the
Addendum was signed by Don Harvey and Mary Lyda, vice-president of Terrace. The two
signed copies of the Addendum were identical in content.

 In a sworn affidavit, Don Harvey stated that the Addendum signed by Mary Lyda
was executed on June 17, 1993. ARC points out that the facsimile transmission date on this copy
is June 17, 1993. Harvey averred that the Addendum signed by Clark Lyda was signed after the
copy signed by Mary Lyda, but prior to the closing of the sale on July 2. In his affidavit, Clark
Lyda stated that Terrace and ARC entered into the Addendum prior to the purchase of the
Building by the Shells. In its motion for summary judgment, ARC also included a copy of an
estoppel certificate signed by Don Harvey, dated June 17, 1993, stating that there is an Addendum
to its lease. By affidavit, Phylis Donelson, employee of Heritage Title Company, stated that on
June 18, 1998 she sent estoppel certificates from tenants in the Building to the Shells by facsimile
transmission. In addition, the Addendum on its face states the Terrace is "the current owner of
the Property."

 In response, the Shells point to the affidavit of James Clayton, a lawyer
representing the Shells at one time in this lawsuit. In his affidavit, Clayton states that on January
23, 1996, Rick Triplett, an attorney at the firm representing ARC, told him over the telephone
that the Addendum was not executed until after the closing between Terrace and the Shells. That
statement from Clayton's affidavit, however, was excluded by the trial court, and the Shells do
not challenge that exclusion in their appellants' brief. With the relevant portion of Clayton's
affidavit excluded, no summary judgment evidence contradicts ARC's assertions of when the
Addendum was executed. Summary judgment may be based on the uncontroverted affidavit of
interested witnesses "if the evidence is clear, positive and direct, otherwise credible and free from
contradictions and inconsistencies, and could have been readily controverted." Tex. R. Civ. P.
166a(c). We conclude that the summary judgment evidence presented by ARC meets this standard
and established that the Addendum was executed before the purchase of the Building by the Shells.

 Finally, the Shells argue that the trial court abused its discretion in denying their
motion for continuance of the hearing on ARC's reurged motion for summary judgment. The
Shells assert that their attorney was suffering from acute anxiety, panic attack disorder, and severe
depression. They contend that if a party discovers it is without an attorney shortly before trial,
the trial court should grant a motion for continuance if the party is not at fault for not having an
attorney. See Wayne C. Holden Corp. v. Verheul, 769 S.W.2d 629, 632 (Tex. App.--Corpus
Christi 1989, writ denied). However, at the hearing on the motion for continuance, the judge
stated that she was not denying the motion on the basis that the attorney in question did not have
a valid reason to continue, but because the Shells apparently had other active counsel who had not
yet been allowed to withdraw and who should have been able to be present. We conclude the trial
court did not abuse its discretion in denying the motion for continuance. Points of error one and
three are overruled.


Use of Trade Name

 In their second point of error, the Shells assert that the trial court erred in granting
another partial summary judgment for ARC on August 27, 1996. In that order, the trial court
declared that ARC had the right (1) to use its trade name in any space obtained through the
exercise of its right of first refusal and (2) to use any such acquired space for its music room
rehearsal business. The Shells argue that there was no justiciable controversy as to the relief
requested and granted. See Camarena v. Texas Employment Comm'n, 754 S.W.2d 149, 151 (Tex.
1988) (Declaratory Judgments Act does not empower court to render advisory opinion or rule on
hypothetical fact situation).

 ARC maintains that in the notice of offer sent by the Shells, the only permitted
trade name that could be used in the space was "Morning Star Trading Company & Natural
Health Center" (the name of the prospective lessee), and the only permitted use was retail and
food (the business of the prospective lessee). ARC asserts that it had notified the Shells several
months earlier that such restrictions on name and use could not be inserted in a notice of offer. 
The Shells contended in depositions and in their arguments that under paragraph 21 of ARC's
original lease, ARC had to accept all the terms of any proposed lease against which ARC
exercised its right of first refusal. Considering the Shells' interpretation of paragraph 21 and their
insertion of the permitted use and allowed trade name into the notices of offer, we conclude that
ARC's request for declaratory relief did not ask for an advisory opinion or a ruling on a
hypothetical fact situation, and that a justiciable controversy existed as to whether the Shells could
restrict trade name and usage of space.

 The Shells argue that the partial summary judgment grants declaratory relief based
on terms found nowhere in the plain language in the Lease. However, terms can be implied in
a contract when necessary to effectuate the purposes of the parties or when it was so clearly in the
contemplation of the parties that they deemed it unnecessary to express it. Freeport Sulphur Co.
v. American Sulphur Royalty Co., 6 S.W.2d 1039, 1041 (Tex. 1928); Tips v. Hartland
Developers, Inc., 961 S.W.2d 618, 621 (Tex. App.--San Antonio 1998, no pet.). Paragraph 5 of
the Lease states that ARC intends to use the premises as a music rehearsal studio. Paragraph 21
grants ARC the right of first refusal to purchase the Building or lease more space in the Building. 
Paragraph 22 grants ARC the exclusive right to operate a music rehearsal studio in the Building. 
It would be wholly illogical for the Lease to grant ARC such a right of first refusal, but then allow
the Shells to prevent ARC from using its name or operating its business in any additional space
it obtained by exercise of that right. We agree that ARC's rights of first refusal surely
contemplated ARC's expanding its music rehearsal into additional space it might lease or
purchase, that such a proposition is implied by the express terms of the original lease, and that
it is the type of term so obvious that the parties found it unnecessary to express. Point of error
two is overruled.


Evidence in Violation of Attorney-Client Privilege

 In point of error four, the Shells assert that the trial court erred in allowing ARC
to gather and present evidence protected by the attorney-client privilege. In October 1996, ARC
filed a motion to compel in connection with the Shells' depositions. During their depositions, the
Shells were asked why they did not lease space to ARC. They stated that their lawyers made that
decision for them. Their attorney instructed them not to answer further questions on the subject
based on the attorney-client privilege. In its motion to compel, ARC asserted that the Shells
waived the privilege as to why the space was not leased to ARC by having their lawyers make that
decision.

 To the degree the Shells complain that the trial court should not have granted the
motion to compel, ARC responds that mandamus would have been the appropriate remedy rather
than an appeal. See Walker v. Packer, 827 S.W.2d 833, 843 (Tex. 1992). In Walker, the relator
sought a writ of mandamus, arguing the trial court abused its discretion by refusing to order a
hospital to produce documents from its insurer's files. Id. at 835-36. The court noted that a party
seeking to protect allegedly confidential documents will not have an adequate remedy by appeal
because a holding by an appellate court on appeal after documents have already been disclosed
will be of small comfort in protecting privileged papers. Id. at 843. We will not reverse the trial
court's judgment on appeal on the ground that the trial court made an error of law unless we
conclude the assertion was in fact error and that it probably caused the rendition of an improper
judgment. See Tex. R. App. P. 44.1. The Shells have not demonstrated how the gathering of
this challenged information probably caused an improper judgment. Accordingly, we turn to the
more relevant issue here: whether the presentation of the gathered information at trial harmed
the Shells.

 First, the evidence presented at trial included deposition testimony of the managing
partner of a firm that represented the Shells for a time during this lawsuit. No objection was made
to this deposition testimony; therefore, no error was preserved. See Tex. R. App. P. 33.1(a);
Bushell v. Dean, 803 S.W.2d 711, 712 (Tex. 1991).

 Also presented at trial was a letter from Joe Shell to the managing partner stating
that the Shells did not want to let ARC expand under any circumstances. The objection to the
admission of this letter was not timely because it was made after the letter had been offered and
admitted into evidence and several questions concerning the letter had already been asked. See
Tex. R. Evid. 103(a)(1).

 However, even if we were to assume the objection had been timely and the
evidence was privileged, no judgment may be reversed on appeal on the ground that the trial court
made an error of law unless the court of appeals concludes that the error complained of (1)
probably caused the rendition of an improper verdict or (2) probably prevented the appellant from
properly presenting the case to the court of appeals. Tex. R. App. P. 44.1(a). The challenged
evidence relates to jury question number one, in which the jury was asked whether the terms in
the notice of offer were presented in bad faith, were commercially unreasonable, or were intended
to defeat ARC's right of first refusal. Considering other testimony at trial that the terms in the
notice of offer were commercially unreasonable, the nature and effect of the terms themselves in
preventing ARC from operating its music rehearsal business in the space in question, and Mr.
Shell's testimony at trial that he did not believe ARC could operate its business in the new space
and comply with all the terms in the notice of offer, we are not convinced that the admission of
this evidence, even if improper, probably caused the rendition of an improper judgment. Point
of error four is overruled.


Evidence of Events Surrounding Previous Default Judgment

 In their fifth point of error, the Shells assert that the trial court erred in excluding
the circumstances surrounding the fact that, in an earlier lawsuit between these same parties,
ARC's counsel had taken a post-answer default judgment against the Shells while Joe Shell was
recuperating from surgery in Ohio. The asserted relevance of these events is that, because of this
previous lawsuit, the Shells became concerned about their dealings with ARC, and it was due to
this concern--rather than bad faith--that the Shells placed the now-challenged terms in its notice of
offer to ARC to make sure the notice fully complied with the accuracy requirements of the Lease. 
ARC responds that the obvious purpose of eliciting this testimony was to make ARC look like
"bad guys" for taking advantage of Joe Shell while he was in the hospital.

 At trial, the trial judge told the Shells' trial counsel that he could ask Joe Shell why
the terms had been placed in the notice of offer and told ARC it could object if the questions or
answers went beyond that inquiry. Joe Shell was then asked why he placed the terms in the notice
of offer, and he answered without objection. The Shells' counsel did not attempt to elicit any
further details on the circumstances surrounding the 1995 default judgment. To be entitled to
complain on appeal, a party must demonstrate that it offered the proof into evidence before the
trier of fact and that it obtained an adverse ruling from the court. See Keene Corp. v. Kirk, 870
S.W.2d 573, 581 (Tex. App.--Dallas 1993, no writ); Lakeway Land Co. v. Kizer, 796 S.W.2d
820, 827 (Tex. App.--Austin 1990, writ denied). The Shells did not attempt to develop any further
details about the previous lawsuit before the jury and therefore has not preserved error as to those
details. Point of error five is overruled.


Jury Question Number One

 In their sixth point of error, the Shells assert that the evidence is legally, or
alternatively, factually insufficient to support the jury's answer to jury question one, which asked: 
"Do you find that each of the terms or conditions of the January 9, 1996 Notice of Offer set forth
on the following page: (a) were imposed in bad faith, or (b) were not commercially reasonable,
or (c) were reasonably designed to defeat ARC's right of first refusal?" The jury answered "yes." 
In reviewing a legal-sufficiency point of error, the court must determine whether there is any
evidence of probative force to support the finding. See Southern States Transp., Inc. v. State, 774
S.W.2d 639, 640 (Tex. 1989). In a factual-sufficiency review, we consider all the evidence, both
supporting and contrary to the jury's determination, and set aside the verdict only if it is clearly
wrong and manifestly unjust. See Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986).

 The Shells' first argument under this point of error is that ARC's response to the
notice of offer was not an effectual acceptance, and therefore the Shells had no obligation to lease
the space to ARC. The notice of offer delivered to ARC on January 9, 1996 listed the space and
potential tenant, permitted use ("retail and food"), rent, security deposit, utilities, and the
following lengthy list of terms and conditions:


Terms and Conditions: The Demised Premises may only be used for the purpose
or purposes specified, and for no other purpose or purposes without the prior
written consent of Landlord. Tenant shall use in the transaction of business in the
Demised Premises the trade name specified, and no other trade names without the
prior written consent of Landlord. Tenant shall not permit any objectionable or
unpleasant odors to emanate from Demised Premises, nor permit smoking, drugs,
alcohol, concealed weapons on any portion of the property, nor place or permit any
loud speaker or amplifier, nor allow any objectionable noises or vibrations to
emanate from the Demised Premises, nor take any other action which in the
exclusive judgement of Landlord would constitute a nuisance or would disturb or
endanger other tenants of the building or unreasonably interfere with their use of
their respective premises, nor do anything which would in Landlord's exclusive
judgment tend to injure the reputation or appearance of the building, nor shall
tenant permit the demised premises to be used in any manner that will impair the
structural strength of the building, nor permit the installment of any machinery or
apparatus the weight or vibration of which may tend to injure or impair the
foundation or structural strength thereof. Tenant shall not make any alterations,
additions or improvements to the Demised Premises without the prior written
consent of Landlord. All alterations, additions, improvements and fixtures (other
than unattached trade fixtures) which may be made or installed by either party
upon the Demised Premises and become the property of Landlord at the
termination of this lease, unless Landlord requests their removal in which event
Tenant shall remove the same and restore the Demised Premises to their original
condition at Tenant's expense. Landlord shall have the right to freely enter upon
the Demised Premises at any reasonable time for the purpose of inspection, all keys
for all portions of the Demised Premises to Landlord. Tenant shall not, without
Landlord's prior written consent, make any changes to or paint the store front, or
install exterior lighting, decorations or paintings; or erect or install any sign, or
advertising media of any type which can be viewed from the exterior of the
Demised Premises. TENANT SHALL NOT ASSIGN OR IN ANY MANNER
TRANSFER THIS LEASE OR ANY ESTATE OR INTEREST THEREIN, OR
SUBLET THE DEMISED PREMISES OR ANY PART THEREOF, OR GRANT
ANY LICENSE, CONCESSION, OR OTHER RIGHT TO OCCUPY OR USE
ANY PORTION OF THE DEMISED PREMISES. This lease supercedes and
revokes all previous negotiations, arrangements, letter of intent, lease agreements,
offers to lease, lease proposals, brochures, representations, and information
conveyed, whether oral or in writing.


In response ARC wrote:


 Please be advised that ARC accepts the offer to lease the space at 1109
South Congress Avenue, Austin, Texas 78704, for the rent, security deposit, and
utilities stated in the second memo.[ (3)]


 Please be advised, however, that ARC reserves the right to have a court
determine whether your stated "Permitted Use" and "Terms and Conditions" are
not commercially reasonable, are specifically designed to try to defeat the ARC's
first right of refusal, or are imposed in bad faith. This includes the provisions that: 
the premises can only be used for your specified purpose; no load [sic] speakers
or amplifiers can be used in the premises; no noise or vibration can emanate from
the premises; conduct will be judged exclusively from the landlord; no
improvements may be made; the landlord shall have the right to freely enter the
premises; no signs can be installed that can be viewed from the exterior of the
premises; and tenant cannot grant the right to others to occupy or use the premises. 
ARC intends to make improvements to the space and use it as a part of its music
rehearsal room business.


 The exercise of an option, like the acceptance of any other offer, must be positive
and unequivocal. Austin Presbyterian Theological Seminary v. Moorman, 391 S.W.2d 717, 720
(Tex.), cert. denied, 382 U.S. 957 (1965). A conditional acceptance to an offer is generally
considered a rejection and counteroffer. See United Concrete Pipe Corp. v. Spin-Line Co., 430
S.W.2d 360, 363-64 (Tex. 1968); Chapman v. Mitsui Eng'g & Shipbuilding Co., 781 S.W.2d
312, 316 (Tex. App.--Houston [1st Dist.] 1989, writ denied). However, a conditional acceptance
to an offer under an option contract is not considered an automatic rejection of that offer. See
Humble Oil & Ref. Co. v. Westside Inv. Corp., 428 S.W.2d 92, 94-95 (Tex. 1968). Furthermore,
an acceptance is effective which is qualified merely by a condition to which the offeree would by
law have been entitled if his acceptance was absolute in terms. See 17A Am. Jur. 2d Contracts
§ 90 (1991). We construe ARC's acceptance in that way. ARC agreed to accept the lease, but
merely reserved the right to have a court determine the validity and enforceability of the
"permitted use" and "terms and conditions" sections, a determination ARC would have been
legally entitled to seek even if its acceptance had not contained language reserving the right to do
so.

 It has been held that if a seller imposes a term in bad faith to defeat an option, the
option holder may validly exercise the option while at the same time rejecting the bad faith term;
therefore, a holder of a first right of refusal has grounds to remove specific conditions from the
contract, or extract other concessions as part of the agreement, if the offered contract contains
certain conditions that are not commercially reasonable, are imposed in bad faith, or are
specifically designed to defeat the option holder's rights. See Texas State Optical, Inc. v.
Wiggins, 882 S.W.2d 8, 11 (Tex. App.--Houston [1st Dist.] 1994, no writ) (citing West Texas
Transmission, L.P. v. Enron Corp., 907 F.2d 1554, 1563, 1566 (5th Cir. 1990), cert. denied, 499
U.S. 906 (1991)). The Shells assert that we should not adopt this exception to the general rule
because the Fifth Circuit and Houston Court of Appeals did not follow Texas law but rather
created new law. We disagree. Texas courts have long recognized that the failure of the optionee
to strictly comply with the terms or conditions of the option contract may be excused when such
failure is brought about by the conduct of the optionor. See Jones v. Gibbs, 130 S.W.2d 265, 272
(Tex. 1939); Cattle Feeders, Inc. v. Jordan, 549 S.W.2d 29, 32-33 (Tex. Civ. App.--Corpus
Christi 1977, no writ). (4) We believe the exception stated in Texas State Optical is reasonable and
applicable to the present case. Even the dissent in Texas State Optical acknowledged that buyers
should not be able to defeat a right of first refusal based on a sham. See 882 S.W.2d at 13
(Cohen, J., dissenting). (5)

 The Shells contend uncontroverted evidence shows that many of the unaccepted
terms were reasonable and would not have prevented ARC's intended use of the space. ARC
responds that its expert, Rick Triplett, testified that all but one of the terms in the notice of offer
were commercially unreasonable and that ARC president Don Harvey testified that the remaining
term was commercially unreasonable. The Shells assert that certain phrases within the sentences
that ARC refers to as separate "terms" are commercially reasonable. For example, in the
sentence that disallows loud speakers or amplifiers, there is also a prohibition on smoking, drugs,
alcohol, and concealed weapons, which even Don Harvey testified would not have prevented ARC
from operating its business in the space.

 Despite the testimony as to the commercial reasonableness of some individual
phrases in the "terms and conditions," there was evidence that before ARC expressed its intent
to expand, the Shells included a shorter list of restrictive terms in their notices of offer. After
being notified of ARC's intent to expand, however, the Shells added restrictive terms to their list. 
Those actions raise an inference that the Shells consciously set out to defeat ARC's right of first
refusal. (6) There was also evidence that although the Shells took the list of terms from a standard
commercial lease form, they altered some of the terms to make them more restrictive as to ARC's
business. For example, while the Shells' notice of offer stated that the tenant shall not place or
permit any loud speaker or amplifier, the standard lease stated that the tenant shall not place any
loud speaker or amplifier on the roof or outside the premises, or where they can be heard outside
the premises or in the common area.

 The jury's response to question one could be supported by evidence of bad faith,
commercial unreasonableness, or intent to defeat ARC's option. Consequently, we conclude that,
even assuming that certain individual "terms" were reasonable, there is evidence of probative
value to support the jury's answer to question one. Even considering the evidence to the contrary,
the verdict is neither clearly wrong nor manifestly unjust. Point of error six is overruled. (7)


Lost Profits

 In their seventh and eighth points of error, the Shells assert that the evidence is
legally or factually insufficient to support the jury's answer to question number two. Question
two asked the jury what sum of money, if any, if paid now in cash, would fairly and reasonably
compensate ARC for its damages, if any, that resulted from the loss of opportunity to lease the
property in January 1996. The question requested one response for lost net profits from January
10, 1996 to January 27, 1997 (the date of trial), and a separate response for lost net profits from
January 27, 1997 through January 31, 2001 (the date ARC's lease would have ended). The jury
responded "$30,000" to the first part and "$80,000" to the second part.

 In order to recover for lost profits, the amount of the loss must be shown by
competent evidence with reasonable certainty. Southwest Battery Corp. v. Owen, 115 S.W.2d
1097, 1098-99 (Tex. 1938). What constitutes reasonable certainty of lost profits is a fact intensive
determination that must be based on objective facts, figures, or other data from which the amount
of lost profits can be ascertained. See Holt Atherton Indus., Inc. v. Heine, 835 S.W.2d 80, 84
(Tex. 1992).

 Layne Lauritzen, ARC's accountant, testified that ARC's tax returns reflected a
profit in 1994 and 1995, and that the corporation was making a profit up to the time of trial. The
Shells assert that ARC's federal tax returns demonstrate ARC has never made a profit and that
a business that has never made a profit should not be allowed to recover for future "lost profits." 
Lauritzen, however, explained that a business such as ARC may not seem profitable facially
because revenue is passed through to the officers and owners as compensation or debt service. 
Lauritzen testified that ARC's income grew steadily from $72,025 in 1990 to $195,853 in 1995. 
There was also testimony that although its current rehearsal rooms were not fully occupied at all
times, there was a waiting list of bands wanting to rent space at peak times. ARC asserts that the
nature of its business, as with businesses such as theaters or restaurants, is such that by having
more room during peak hours, ARC could increase its revenues and profits. Lauritzen calculated
lost profits based on additional income that would have resulted from the three rehearsal rooms
and nine lockers planned for the extra space. He explained that, in order to calculate lost profits,
he took the additional amount of income that would be generated and subtracted the projected
expenses, including a discount rate to account for the time value of money. Income projections
were based on financial statements prepared by Lauritzen in previous years. Expense projections
were based on expense reports from specific previous years. Lauritzen also testified as to the
difference and effect of fixed and variable expenses on his calculations. Lauritzen's estimate for
lost profits for the 1996-1997 period was $30,226. His estimate for lost profits for the 1997-2000
period was $120,511.

 The Shells assert that this evidence is no more sufficient than that rejected as
insufficient in Holt Atherton. We disagree. In Holt Atherton, only one question was asked that
touched on lost profits. 835 S.W.2d at 84. Here, the testimony as to lost profits was extensive
and easily met the "more than a scintilla" standard of a legal-sufficiency review. While the Shells
did not present testimony of other accountants to challenge Lauritzen's calculations, trial counsel
carefully cross-examined Lauritzen on his methodologies as well as the uncertainties associated
with both his calculations and the music business generally in Austin. Nonetheless, considering
testimony both favoring and disfavoring the jury's finding, we conclude the verdict was neither
clearly wrong nor manifestly unjust. Points of error seven and eight are overruled.


Subleasing

 In its ninth point of error, the Shells assert that the trial court erred in finding that
ARC has the right to operate its music rehearsal business at the leased premises, including the
rental of music rooms and lockers, without obtaining the landlord's consent. In its tenth point of
error, the Shells assert that the trial court erred in ordering that the Shells take nothing on their
counterclaim on the issue of subleasing, as the evidence proved conclusively that ARC wrongfully
subleases in violation of the lease. Alternatively, the Shells assert that the trial court's finding is
against the great weight and preponderance of the evidence and is manifestly unjust.

 We reject the Shells' contention that the lease's prohibition on subleasing prohibits
ARC's renting of space as music rehearsal rooms. While ARC's lease prohibits subleasing, it also
expressly allows ARC to operate a music rehearsal room business. In a contract, a specific term
controls over a more general one. See Guadalupe-Blanco River Auth. v. City of San Antonio, 200
S.W.2d 989, 1001 (Tex. 1947); City of San Antonio v. Heath & Stich, Inc., 567 S.W.2d 56, 60
(Tex. Civ. App.--Waco 1978, writ ref'd n.r.e.). Points of error nine and ten are overruled.


CONCLUSION

 Having overruled the Shells' points of error, we affirm the judgment of the trial
court.



 

 J. Woodfin Jones, Justice

Before Chief Justice Yeakel, Justices Aboussie and Jones

Affirmed

Filed: August 13, 1998

Do Not Publish

1. Paragraph 21 of the Lease provided, in pertinent part:


Lessor agrees that if at any time during the initial lease term or any renewal periods
Lessor shall receive a bona fide offer to lease any additional space in the building in
which the Leased Premises are located, which Lessor desires to accept, Lessor will
give written notice ("Notice of Offer") of such offer to Lessee, identifying the
proposed lessee and setting out accurately and in detail the rent and terms of the
proposed lease. In each event, Lessor agrees that Lessee shall have the right, at
Lessee's election, to lease such property, or any part thereof proposed to be leased by
Lessor, for the price and terms specified in the Notice of Offer . . . .


 Lessor also agrees that if at any time during the lease term or renewal periods
Lessor shall receive from a party unaffiliated with Lessor a bona fide offer to purchase
the real property on which the Leased Premises are located, which Lessor desires to
accept, Lessor will give written notice ("Notice of Offer") of such offer to Lessee,
identifying the proposed purchaser and setting out accurately and in detail the price
and terms of the proposed sale. In each event, Lessor agrees that Lessee shall have
the right, at its election, to purchase the leased Premises, or any part thereof proposed
to be sold by Lessor, for the price and on the terms specified in the Notice of Offer
. . . . If the Leased Premises shall be timely sold by Lessor to a third party after
Lessee has failed to exercise its right of first refusal, the third party purchaser shall
take the interest in the Leased Premises from Lessor free from any right of refusal of
Lessee . . . .
2. The Shells contend that we should analyze ARC's original motion for summary judgment
and re-urged motion for summary judgment separately because they are substantively different. 
We acknowledge that the second motion adds one argument. We find separate analyses of ARC's
two motions unnecessary, however, because we conclude that the added argument is not material
to our decision. Nonetheless, we have reviewed and considered all responses made by the Shells
to both motions.
3. Apparently two copies of the notice were hand delivered to ARC on January 9, 1996. The
second notice contained higher rent prices.
4. The Shells assert that these cases are inapposite because the optionees were not required to
match the price and terms of the proposed lease like ARC is required to do. However, in the
present case ARC did agree to accept the rental price offered, and, as we concluded under point
of error two, matching of the proposed lease's terms did not require such strict matching of terms
that ARC could be effectively prohibited from operating its business in the proposed premises.
5. The Shells contend that even if the exception is accepted by this Court, it should be limited
to situations in which the terms challenged by the offeree are minor variations from the terms in
the offer. We decline to accept that limitation because the resulting rule would suggest that the
conduct is permissible as long as the optionor uses fraud or bad faith in trampling substantial
rights.
6. The Shells contend they added the "terms and conditions" out of concern for submitting a
sufficient notice of offer, especially after they were sued by ARC in 1995 on another matter. Of
course, the jury is free to believe or disbelieve any part of the evidence in making its finding. See
McGalliard v. Kuhlmann, 722 S.W.2d 694, 697 (Tex. 1986).
7. The Shells also argue that the relevant question is not whether the notice of offer contained
terms not commercially reasonable, are imposed in bad faith, or are specifically designed to defeat
the option holder's rights, but whether the proposed Morning Star lease contained terms with
those qualities. We disagree. Paragraph 21 of ARC's original lease states that ARC has the right,
at its own election, to lease property identified in the notice of offer, or any part thereof, for the
price and terms specified in the notice of offer. It therefore seems perfectly appropriate that the
inquiry focus on the contents of the notice of offer.


 Regular">Before Chief Justice Yeakel, Justices Aboussie and Jones

Affirmed

Filed: August 13, 1998

Do Not Publish

1. Paragraph 21 of the Lease provided, in pertinent part:


Lessor agrees that if at any time during the initial lease term or any renewal periods
Lessor shall receive a bona fide offer to lease any additional space in the building in
which the Leased Premises are located, which Lessor desires to accept, Lessor will
give writ