Mitchell v. Flanagin 



TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-94-00726-CV







Katherine Rogers Mitchell, Appellant



v.



Raymond Kyle Flanagin, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT


NO. 93-02618, HONORABLE JOHN K. DIETZ, JUDGE PRESIDING







PER CURIAM


 Appellant Katherine Mitchell appeals the trial court's order removing her as sole
managing conservator and appointing appellee Kyle Flanagin sole managing conservator of the
parties' three boys. The court ordered that custody be modified following a jury trial. On appeal,
Katherine challenges the evidentiary support for the order. We will affirm the order of the trial
court.

 In six points of error, Mitchell attacks the legal and factual sufficiency of the
evidence to support the three findings required to change sole managing conservatorship. The
trial court may modify a decree designating a sole managing conservator if (1) the circumstances
of the child, sole managing conservator, or possessory conservator have materially and
substantially changed since the date the divorce decree was rendered; (2) the retention of the
present sole managing conservator would be injurious to the child's welfare; and (3) the
appointment of the new sole managing conservator would be a positive improvement for the child. 
Tex. Fam. Code Ann. § 14.08(c) (West Supp. 1995). (1)

 In this case, the jury was asked the single question whether Mitchell should be
removed as sole managing conservator and Flanagin be appointed sole managing conservator. 
The court instructed the jury that a decree designating a sole managing conservator could not be
modified unless the three required factors were established. The court also instructed the jury that
an affirmative answer must be based on a preponderance of the evidence. The jury answered the
question affirmatively.

 The court cannot render a decree that contravenes the jury's verdict on the issue
of changing sole managing conservatorship, which is binding rather than merely advisory. Tex.
Fam. Code Ann. § 11.13 (West 1986 & Supp. 1995); Shannon v. Newman, 400 S.W.2d 861, 861
(Tex. Civ. App.--Amarillo 1966, no writ). The court must render judgment in accordance with
a verdict determining whose custody will best serve the child's interests when the verdict is
supported by evidence of probative force. Shannon, 400 S.W.2d at 861. By affirmatively finding
that the managing conservatorship should be changed, the jury necessarily found that each of the
three factors was established by a preponderance of the evidence. Considine v. Considine, 726
S.W.2d 253, 255 (Tex. App.--Austin 1987, no writ). We may review the jury's verdict for legally
and factually sufficient evidence. Shannon, 400 S.W.2d at 861; see Thompson v. Uzzell, 541
S.W.2d 499, 501 (Tex. Civ. App.--Tyler 1976, no writ).

 In her first two points of error, Mitchell attacks the sufficiency of the evidence to
support the finding that the circumstances of either the children, herself, or Flanagin had
materially changed since the decree was rendered. To prove that a material change of
circumstances has occurred, the movant must establish the conditions that existed when the prior
order was rendered and show what material changes have occurred up to the date the motion to
modify was filed. Considine, 726 S.W.2d at 255; Gibbs v. Greenwood, 651 S.W.2d 377, 379
(Tex. App.--Austin 1983, no writ).

 We review Mitchell's no-evidence challenge by considering only the evidence and
inferences that tend to support the finding and disregarding any evidence and inferences to the
contrary. Garza v. Alviar, 395 S.W.2d 821, 822 (Tex. 1965). If any probative evidence supports
the finding, it must be upheld. Southern States Transp., Inc. v. State, 774 S.W.2d 639, 640 (Tex.
1989). To review Mitchell's factual-sufficiency challenge, we consider all the evidence and will
set aside the finding only if the evidence supporting it is so weak, or the evidence to the contrary
so overwhelming, as to make it clearly wrong and unjust. Cain v. Bain, 709 S.W.2d 175, 176
(Tex. 1986); West v. Watkins, 594 S.W.2d 800, 802 (Tex. Civ. App.--San Antonio 1980. writ
ref'd n.r.e.).

 In August 1992, before the parties divorced, they had agreed that Mitchell and the
boys would move from Houston to Austin for Mitchell to study at the University of Texas (UT). 
UT had granted Mitchell a two-year fellowship to obtain a master's degree in French. The parties
were divorced by a decree signed June 15, 1993. The decree appointed Mitchell sole managing
conservator of the three boys, but accorded Flanagin possession every other weekend, over spring
break, and, during 1993, over Thanksgiving and the post-Christmas vacation. Flanagin moved
to modify conservatorship in November 1993, at which time Stuart was twelve, Tom was ten, and
Will was four years of age. The modification hearing occurred in August 1994. 

 At the modification hearing, testimony was elicited as to statements made to the
trial court at the divorce hearing. Mitchell had stated at the divorce hearing that UT granted her
two years of financial aid for her master's degree, the terms of which allowed her to concentrate
on her studies the first year. In return for the aid, UT expected her to teach classes the second
year, which began in the fall of 1993. She was not free to work for anybody else under the terms
of the financial aid. Mitchell stated at the divorce hearing that she would be a salaried teaching
assistant for the school year beginning 1993 and that she hoped to be an assistant instructor if she
later decided to pursue a doctorate. She stated that she would like to pursue a doctorate, and that
if she did, she would return to Houston and attend Rice University. It would take five years to
obtain both a master's and a doctorate degree. Mitchell testified that she would be in Austin
attending UT until at least 1994. 

 Testimony at the modification hearing also focused on the expectations the parties
had at the time of the divorce hearing. Mitchell testified that one reason she chose UT over other
schools was that Flanagin could more easily be with the boys. UT's location in Austin was the
best for their family compared to other schools she had considered, such as the University of
Toronto. Mitchell thought that UT was more convenient for Flanagin and considered it important
for the family to be near each other. Mitchell stated that, when the divorce decree was rendered,
she had a teaching assistantship for the upcoming fall, she expected to be in Austin fulfilling the
assistantship, and her goal for the future was to complete her master's degree at UT. 

 Testimony was adduced at the hearing on the parties' actions since the divorce and
on Mitchell's plans for the future. During the summer of 1993, Mitchell undertook six weeks of
intensive training in French at Middlebury College in Vermont. Mitchell testified that she first
thought she had a chance to go to Paris while at Middlebury. When she had applied to
Middlebury for financial aid in January 1993, however, Mitchell indicated that she tentatively
planned to participate in Middlebury's year-long study-abroad program.

 The divorce decree required Mitchell to notify Flanagin in writing thirty days
before she changed residence or, if she could not have known that early, five days after she knew
of the change. Mitchell obtained passport photos and passports in July 1993, applied for her visa
on August 10, and received the visa on August 14. Mitchell told Flanagin on August 16 that she
and the boys would spend the upcoming school year in Paris. The four departed for Paris on
September 2 or 3, 1993, and returned to Texas at the end of the school year. Mitchell did not
allow Kyle to see the boys off at the airport when they left. During their stay in Paris, Flanagin
visited the boys for a week in April 1994.

 Mitchell stated at the modification hearing that she planned to complete her
master's degree at UT and then to pursue her doctorate. At the time of the modification hearing,
she had done half the work toward the master's degree and she could expect to spend at least three
years working on her doctorate. The classes she had taken in France did not count toward the
completion of her master's degree from UT nor did they provide any prerequisites for a doctorate. 
Her plans as to when she would pursue the doctorate were uncertain because she might have to
work before she could continue. Mitchell ultimately hoped to teach at the college level. Mitchell
affirmed that she wanted to be free to pursue her graduate degree at the best possible school. She
would like to study for her doctorate at the University of Toronto, Stanford University, or Yale
University.

 Mitchell was not contractually obligated to work for UT during the school year
beginning September 1994, but she was currently proceeding on the understanding that she would. 
It was her plan to stay in Austin for the coming school year, and she did not plan to leave. 
Mitchell testified that she was willing to commit not to move again without giving Flanagin notice,
meeting with him, and trying to discuss the issues involved. She would not move if she believed
that it was not in the children's best interest. Mitchell testified that, when she left for France, she
never intended to stay longer than nine months.

 A friend Mitchell had made in Paris, Victoria Moussaron, testified that while in
Paris Mitchell told her that she wanted to work on a doctorate and that they discussed several
possible schools, including UT. Mitchell expressed her desire to continue her studies in Paris,
if possible. 

 Flanagin testified to his belief that Mitchell was again planning to leave to pursue
her doctorate, possibly for a number of years. He could not predict where she would work and
at which university she would eventually establish tenure.

 A change in the children's home surroundings can be a material change of
conditions that will authorize a modification of conservatorship. Leonard v. Leonard, 218 S.W.2d
296, 301 (Tex. Civ. App.--San Antonio 1949, no writ). The testimony showed that when the trial
court rendered the divorce decree, all those involved expected Mitchell to live in Austin and to
complete her master's degree. Mitchell had asserted that she would attend UT in Austin until at
least 1994. Such expectations could reasonably have formed part of the basis on which the trial
court awarded Mitchell sole managing conservatorship. Contrary to Mitchell's assertions,
however, she took the boys from Austin to Paris within three months after the divorce decree was
rendered and remained there about nine months. 

 An adult person's future conduct may well be measured by his recent deliberate
past conduct as it may be related to the same or a similar situation. De Llano v. Moran, 333
S.W.2d 359, 361 (Tex. 1960); Wallace v. Fitch, 533 S.W.2d 164, 167 (Tex. Civ. App.--Houston
[1st Dist.] 1976, no writ). Mitchell never testified at the modification hearing that she would
pursue her doctorate at UT. The testimony instead showed that Mitchell's plans for the future
were unsettled, but that two significant determinants were her financial condition and her desire
to study at the best possible school, including a school in Paris. The jury had the opportunity to
observe and evaluate the personalities of the contending claimants, to weigh the credibility of their
testimony, and to assess the physical, mental, moral, and emotional needs of the children. 
Wallace, 533 S.W.2d at 168. Mitchell's deliberate decision to take the boys to Paris for the
school year was some evidence of a material change in the expectations on which the original
decree had been granted. See O. v. P., 560 S.W.2d 122, 126 (Tex. Civ. App.--Fort Worth 1977,
no writ). All the testimony, considered together, was not so weak that a finding of material
change was unjust. We therefore overrule points one and two.

 In points of error three and four, Mitchell challenges the legal and factual
sufficiency of the evidence to support the finding that retaining her as the sole managing
conservator would be injurious to the children's welfare. In points five and six, she challenges
the legal and factual sufficiency of the evidence to support the finding that appointing Flanagin
as sole managing conservator would be a positive improvement for the children.

 Mitchell testified that spending the school year in Paris benefitted the boys in many
ways and was in no way harmful to them. While taking the boys with her strained her time and
money, she believed it was better for the boys to go with her. They learned to speak French,
made friends who were French, learned to ride the Paris subway and to find their way around the
city, and became more self-confident. Victoria Moussaron also testified that the boys functioned
well in French and exhibited self-reliance. Mitchell agreed that she took the boys to Paris
knowing that they were still traumatized by the recent divorce. She stated that the boys missed
Kyle while they were in Paris. Mitchell bought Flanagin's ticket to Paris for spring break under
court order.

 Mitchell maintained that making Flanagin managing conservator would not be a
positive improvement for the boys because he did not act with their best interests in mind. After
Flanagin learned that Mitchell was spending the summer of 1993 at Middlebury, he did not pick
the boys up until about seven days after his visitation had started, leaving them with Mitchell's
mother and sister. Flanagin explained that he had been angry at Mitchell for matters related to
the divorce and that he thought she might not go to Middlebury if he did not take the boys for the
summer. On hearing from Mitchell's mother and sister that the boys felt abandoned, however,
Flanagin picked the boys up and kept them for the summer. Flanagin also admitted that during
the most recent summer, he had spanked Tom with a belt one morning when Tom refused to go
to school. He realized that physical discipline was inappropriate now that the boys were more
independent and testified that he no longer intended to use it. Flanagin wrote the boys once while
they were in Paris, but called them almost every week.

 Mitchell described her relationship with the boys as very open and herself as being
in touch with their interests. She stated that the boys were more comfortable with her than with
Flanagin. The hours she would work as a teaching assistant were flexible, allowing her to
minimize the time the boys would spend alone. She would be able to adapt her schedule to their
needs, such as picking them up and being home after school. While she was currently living in
a single room near UT, she planned to move into the same apartment for the school year that she
had lived in before going to Paris. Mitchell had sold her car before leaving for Paris and did not
know when she would get a new car. Her salary as a teaching assistant was $1,000 a month, and
she had applied to UT for a loan for the upcoming year.

 Flanagin testified that he had lived in the neighborhood of Houston Heights for
almost ten years, and in the particular house in that neighborhood for the past year and one half. 
The three boys had all grown up in that neighborhood and the older two had attended the schools
there. The same kindergarten teacher who had taught the two older boys would also be teaching
the youngest in the fall. All three sons had been accepted into accelerated school programs. 
Flanagin had arranged for a woman who lived next door to the elementary school to take Will to
school, where she worked as a volunteer. Will would stay at her house after school until Flanagin
picked him up after work. The older boys would take school buses or carpool to and from school;
they would either stay by themselves or participate in an after-school program until Flanagin
returned from work. The older boys both had friends that attended the schools in the
neighborhood. They had played baseball every year except the one they spent in France.

 Flanagin worked as a project manager for a company that builds electrical
equipment. He worked five days a week, from 8 a.m. to 5 p.m. and earned $40,000 a year plus
incentive pay. He had been employed by the same company since 1982, was happy in his work,
and considered his employment stable. His business trips were minimal. Flanagin's father,
stepmother, and two siblings with their children also lived in Houston.

 Flanagin viewed the possibility that the boys would be away from him while
Mitchell was working on her doctorate and establishing tenure as bad for the boys. He did not
think that he could maintain his relationship with them over a long distance. Flanagin believed
that his oldest boy, who was starting high school the next fall, needed a stable place to stay and
finish high school. He thought that children needed both their parents and that teen-aged boys
particularly needed the guidance of a father. Given the potential for children to get into trouble,
the need for both parents was strong. Flanagin made an effort to do a lot of things the boys liked
over the most recent summer, such as fishing, crabbing, and camping. He did not think that the
time the boys spent abroad benefitted his relationship with them, and he thought that the boys
needed to spend time with him more than they needed to learn French.

 Moussaron testified that Mitchell did nothing that exposed the children to danger
during their stay in Paris, that Mitchell was a nurturing mother whose care was good for the
children, and that she always tried to do what was best for them.

 The evidence shows that, while Mitchell and the boys spent the school year in
Paris, Flanagin was unable to see the boys every other weekend as set out in the divorce decree. 
Flanagin testified that the boys' time abroad was not beneficial to his relationship with them. 
Mitchell's effective deprivation of beneficial time Flanagin and the boys could have spent together
is some evidence of circumstances injurious to the boys. See Guy v. Stubberfield, 666 S.W.2d
176, 180 (Tex. App.--Dallas 1983, no writ). Mitchell's taking the boys to Paris when they were
still traumatized by the divorce is further evidence of injurious circumstances. Although Mitchell
testified at the modification hearing that she planned to stay in Austin for the next school year,
her plans as to where and when she would pursue her doctorate were uncertain. She did not
necessarily plan to stay at UT and did not exclude the possibility of choosing to study in
Connecticut, Toronto, or Paris. Mitchell's commitment to obtaining a doctorate under these
circumstances fairly raises the inference that she and the boys would move some distance from
Flanagin in the near future. Her future conduct may be gauged by her recent actions in taking the
boys to Paris. De Llano, 333 S.W.2d at 361; Wallace, 533 S.W.2d at 167. Mitchell's belief that
the nine months in Paris was in no measure harmful to the boys enhances the likelihood that she
would be willing to move away again. 

 The jury, again, was entitled to observe and evaluate the parties' personalities,
weigh their testimony, and assess the needs of the children. Wallace, 533 S.W.2d at 168. In
view of the likelihood that Mitchell would move again, with the changes a move would entail, we
determine that some evidence supports the finding that retaining Mitchell as managing conservator
would be injurious to the boys' welfare. We believe that all the circumstances taken together
provide sufficient evidence that retaining Mitchell as managing conservator would be injurious
to the children's welfare.

 The uncertainty of Mitchell's living arrangements stands in contrast to the stability
of Flanagin's. Living with Flanagin, the boys would be in a familiar neighborhood and school
system and would see their old friends. It was not foreseeable that Flanagin's living arrangements
would change. The continuity in living arrangements Flanagin offered the boys is some evidence
that making him managing conservator would be a positive improvement. The likelihood that
Flanagin would be an absentee father rather than one actively involved in his boys' lives through
their teen-age years is additional evidence that appointing him managing conservator would be a
positive improvement. Even considering Flanagin's failure to pick the boys up on time for their
first summer visitation, we cannot say that the finding that Flanagin's appointment would be a
positive improvement is so weak or so against the great weight of the evidence as to be manifestly
unjust. We therefore overrule points three through six. 

 In point of error seven, Mitchell argues that the trial court erred in denying her
motion for directed verdict. At the close of Flanagin's case-in-chief, Mitchell moved for directed
verdict on the issues that retaining Mitchell as managing conservator would be injurious to the
children's welfare and that appointing Flanagin as managing conservator would be a positive
improvement for the children. Mitchell failed to renew her motion at the close of all the evidence,
thereby waiving any error. Buckner v. Buckner, 815 S.W.2d 877, 879 (Tex. App.--Tyler 1991,
no writ). In any event, we have determined that some evidence exists on these two issues. We
overrule point seven.

 We affirm the order of the trial court.


Before Chief Justice Carroll, Justices Aboussie and Jones

Affirmed

Filed: August 30, 1995

Do Not Publish
1. The seventh-fourth legislature has repealed and recodified this section without
substantive change. Because the new law does not apply to proceedings pending on April 20,
1995, we cite to the former Title Two of the Family Code. See Act of April 6, 1995, 74th
Leg., R.S., ch. 20, sec. 1, § 156.01, 1995 Tex. Sess. Law Serv. 113, 173 (West).