Opinion issued March 18, 2004













In The
Court of Appeals
For The
First District of Texas




NO. 01-02-01266-CV




RHODA TOMASCO, Appellant

V.

THE ESTATE OF DONALD JOE TOMASCO, SR.; CHAMBERLAIN,
HRDLICKA, WHITE, WILLIAMS & MARTIN; LAWRENCE D. PENNONI;
AND PAUL MARTIN, Appellees




On Appeal from Probate Court No. 1
Harris County, Texas
Trial Court Cause No. 294,687-401




MEMORANDUM OPINION
           Appellant, Rhoda Tomasco, appeals the take-nothing judgment rendered against her
by the trial court notwithstanding the jury verdict in her favor. We affirm.
 

BACKGROUND
           Rhoda and Donald J. Tomasco (Don Sr.) were married in 1959. Three children, Don
Jr., Karen, and Kirkland, were born to the marriage. Don Sr., an architect, became involved
in land development and investments, and Rhoda founded and became director of Sunshine
Kids Foundation (Sunshine Kids), a non-profit foundation that organized and funded
recreational trips for children with cancer and their families. Rhoda’s involvement was
initially as a volunteer, raising money and organizing trips. In 1989 she began taking a
salary, which, at the time of trial, was about $80,000. The Sunshine Kids’ annual budget at
the time of trial was $1.5 to $2 million.
           In 1984, Don Sr., wanting to protect his assets from creditors, discussed with his
attorney, Carlos Kepke, of the firm of Chamberlain, Hrdlicka, White, Williams & Martin
(Chamberlain), the potential to achieve his goals through foreign trusts. Kepke informed him
that such trusts could not be established with earned income, but could be created and funded
through a will or through a gift from a foreign national who is not a resident of the United
States. Kepke advised Don Sr. that, should a foreign national express a desire, preferably in
writing, to make such a gift, Don Sr. could then ask Kepke’s advice on the best way to handle
it. Kepke indicated that he could then proceed to set up the foreign trust. 
Creation of Foreign Trusts
           On June 25, 1984, Jaime and Lucila Fernandez, citizens of Mexico and parents of one
of the cancer patients who had benefitted from the Sunshine Kids program, wrote Rhoda and
Don Sr. to thank them for their kindness and support during the time they were in Houston. 
To show their appreciation, the Fernandezes asked Rhoda and Don Sr. to come to Mexico
City to receive a gift. The Tomascos went to Mexico City and, on July 26, 1984, they and
the Fernandezes executed a trust indenture that had been prepared by Chamberlain and that
was funded with $25,000 purportedly given by the Fernandezes to the Tomascos.



           On September 5, 1984, Rhoda’s mother, Margie Morrow, executed two codicils,
prepared by Chamberlain, to her will. The first codicil made a special bequest to Rhoda in
the sum of $1,000 to establish a trust and set forth the terms and provisions of the trust to be
known as the Kaufman Trust. The second codicil made a similar bequest to Mrs. Morrow’s
son, Terry Morrow, to establish a trust to be known as the Morrow Trust. Mrs. Morrow died
on September 23, 1984, and the Kaufman Trust was established. 
           After Mrs. Morrow’s death, Chamberlain became concerned that the second codicil
creating the Morrow Trust might nullify the first codicil. In a series of telephone calls, Don
Sr., Rhoda, Kepke, and Mrs. Morrow’s attorney, Jerry Huff, discussed a plan to persuade
Terry to enter into an agreement with Rhoda that the second codicil would not be probated. 
That agreement was executed on October 18, 1984. 
           On September 4, 1984, Joaquin and Etelvina Rodriguez, citizens of Mexico and
parents of a patient who had benefitted from the Sunshine Kids program, wrote Don Sr. and
Rhoda, asking them to come to Mexico City to accept a gift in appreciation for their kindness
and assistance during the time the Rodriguezes were in Houston for their son’s treatment. 
The Tomascos again went to Mexico City, and, on October 18, 1984, they and the
Rodriguezes executed the Kapital Trust, which was funded with $15,000 apparently given
to the Tomascos by the Rodriguezes. 
           The beneficiaries of the Konig, Kaufman, and Kapital Trusts (the Trusts) were Don
Sr., Rhoda, Don Jr., Kirkland, and Karen. The Trusts named the Bank of Butterfield in
Bermuda as Trustee and Don Sr. as Trust Protector with power to replace the Trustee with
or without cause on five days’ notice. The Trusts also granted Don Sr. a limited power of
appointment. The Trusts provided that, upon the death of Don Sr., a committee consisting
of Rhoda, Don Jr., Kirkland, and Karen, acting by majority vote, was to serve as Trust
Protector, with Rhoda having three votes and Don Jr., Kirkland, and Karen having one vote
each. The Trustee had the sole and absolute discretion to distribute the corpus and income
of the Trusts to any one or more of the beneficiaries for a variety of uses, including 
maintaining their “accustomed standard of living.” In 1985, Don Sr. also established an
insurance trust and a family trust, which were not foreign trusts. Don Jr. was the trustee of
the insurance trust and Rhoda was the beneficiary. Don Sr. was the trustee of the family trust
and Don Jr., Kirkland, and Karen were the beneficiaries. 
 

Divorce and Bankruptcy
           Rhoda testified at trial that she began to consider leaving Don Sr. in 1988 and that she
finally left him in 1990 or 1991. She filed for divorce in June 1992. In March 1993, Don
Sr. filed a petition in bankruptcy under chapter 7, and in April he filed a schedule of assets
and liabilities that showed assets of $495,000 consisting of his homestead and liabilities of
$57,800,000. In 1994, Don Sr. was diagnosed with cancer. 
           On April 24, 1995, Don Sr. filed an Inventory and Appraisement in the divorce case. 
The Trusts were not included in the inventory. On September 20, 1996, Don Sr. exercised
his special, limited powers of appointment over the Trusts to provide that, upon his death,
all of the assets of the Trusts were to be placed into a new trust to be called the Konig Trust. 
The Bank of Butterfield was to be the Trustee, and Don Jr. and Karen, jointly, were to be the
Trust Protector. Rhoda was not included as a beneficiary of this Konig Trust. The funds of
this Konig Trust were to be divided equally into three separate trusts, each benefitting one
of the Tomasco children. The final divorce decree, signed on November 8, 1996, did not
refer to any of the foreign trusts or to the life insurance trust. The decree ordered that Don
Sr., as trustee of the family trust, provide Rhoda with quarterly financial statements of that
trust. Don Sr. died on November 15, 1997. 
The Lawsuit
           In August 1998, Don Jr. talked to Rhoda about the Trusts. On February 5, 1999,
Rhoda filed her lawsuit against the Estate, Don Jr., and Karen, alleging that she had recently
learned about the foreign trusts into which Don Sr. had placed community assets without
informing her. Rhoda requested declaratory relief and, in the alternative, a constructive trust
on the Trusts’ assets. On June 29, 1999, Rhoda filed her first amended petition, which added
Chamberlain and two of its attorneys, Lawrence D. Pennoni and Paul Martin, as defendants. 
           In her third amended petition, Rhoda requested a declaratory judgment that the
transfers of property to the Trusts were not disclosed and that, through operation of a
provision in the Tomasco’s divorce decree, the Trust assets were awarded to her. In the
alternative, Rhoda requested that a constructive trust in her favor be imposed on the assets
held in the Trusts because Don Sr. had violated his fiduciary obligation to her and because
of the constructive-trust provision in the divorce decree that orders that the party in
possession and control of undisclosed community property is a constructive trustee of the
property for the benefit of the other party. Against Chamberlain, Pennoni, and Martin, Rhoda
asserted causes of action for negligence, gross negligence, vicarious liability, violation of the
Texas Deceptive Trade Practices Act, breach of fiduciary duty, conspiracy, negligent
misrepresentation, negligence per se, fraudulent misrepresentation, and fraud. Rhoda
requested actual and punitive damages, treble damages, forfeiture of fees, and attorney’s fees. 
Rhoda also asserted the discovery rule and alleged that she did not learn of the Trusts and the
transfers of community property to them until late August or early September 1998.
           At trial, Rhoda testified that the first time she knew that there were trusts outside the
country was when Don Jr. told her in August 1998. When asked how she could not know
that a codicil to her mother’s will created the Kaufman Trust, she testified that she did not
know what the codicil to her mother’s will was and did not understand “legal things.” She
further testified that she did not know what the second codicil was, did not know about an
issue regarding the two codicils, and did not know whether she signed an agreement
regarding the creation of the Morrow Trust. She also testified that she did not remember
whether she had any discussions with Jerry Huff. 
What Rhoda Knew and When She Knew It
           Transcriptions of three taped telephone conferences on October 9, 1984 were admitted
into evidence during the trial. The participants in the first call were Rhoda, Don Sr., and
Huff. Huff had spoken with Terry about a problem with the two codicils and reported that
Terry had indicated, “if the only way out of it was not to probate this codicil, well, then — 
then he said, Let’s just don’t do it.” Rhoda asked, “Did it – it didn’t seem to be a – a big deal
particularly in his mind or . . . something that he had hung a lot of personal stock on?” Huff
assured her that that was not the case. In discussing whether Terry would have any use for
a trust as set out in the codicil, the following was said: 
[Rhoda]:You know, it could be, like I mentioned to Don, the kind
of thing that they never wish to operate on that level of a business type of thing
and they could just have it sit and - - and they be only involved in more
tangible things in the immediate future like the farm and immediate things
there in Austin. 
 
[Don Sr.]:Well, to them, Rhoda, they might be more interested in
the $1,000. 

                      . . . .
 
[Rhoda]:Well, that might come through more if Jerry [Huff] says
it. You know, Hey, this may be something that - - I mean, I don’t know. I
think that Terry has a lot of confidence in your judgment, and I wish - - I wish
the world for him to have something. And, you know, maybe we’re in error
of building it up to be such a big thing when, really, in fact, you know, it isn’t
to them, but is to Don and his business.
 
[Huff]:Certainly. Well, this is something in Terry’s and my
discussion, you know, we talked about how that now - - although I have no
experience with foreign trusts like this, I told him, I said, Terry, it appears to
me that this is really for the people that are going to sock away the big bucks. 

           They discussed the effect that Terry’s knowing he would receive a large amount of
money when his mother’s will was probated might have on Terry. Don Sr. was concerned
that it might cause Terry to think he needed a trust. They continued their discussion as
follows: 
[Huff]:Well, you know, of course, I was thinking about this after
we talked this morning, Don. And - - and I may, you know, be completely
wrong, but I’m really not looking for any problems with Terry on this thing
just because of the impression that I got from him last week. He was so - - so
amicable. And it was, you know, Hey, I don’t really care. And if it’s going to
hurt Rhoda, I don’t want to do it. 
 
[Rhoda]:God - -
 
[Huff]:So that was the approach I was going to take and - -
 
[Rhoda]:Yeah. 
 
[Huff]:- - and I really expect him to say, Well, let’s just don’t
probate that darn thing. 
 
[Rhoda]:Yeah.
 
[Don Sr.]:Yeah, I do too. I really do. You know, we think - -
 
[Rhoda]:Especially if Jerry handles it. I think he has - -
 
[Don Sr.]:Yeah. 
 
[Rhoda]:- - a lot of - - a lot of respect for Jerry.
 
[Don Sr.]:And why don’t you do this. Say, Okay, Terry. What I’ll
do, I’m going to send Don - - next time say, I understand he’s doing some
work in Austin. I’m going to send - - make me sound like a messenger. 
 
[Rhoda]:Yeah.
 
. . . .
 
[Don Sr.]:I’m going to send Don as a messenger, if you don’t mind. 
I wish you’d put it just that way. 
 
[Huff]:Okay, sure. 

           After Huff got off the line, Don Sr. asked Rhoda if she felt better about “that,” and
Rhoda said, “Yeah, I do. I think if Jerry handles it, that it’ll be sort of unbiased opinion.” 
           Huff talked to Terry, then called the Tomascos again that same day. Huff reported
that everything was settled and that Terry would sign whatever needed to be signed. Huff
said that he told Terry that Don Sr. would be bringing up the papers, and that Terry had asked
whether Huff would see them first. Huff said that he had assured Terry that he would review
them. Rhoda expressed some concern that Terry might be disappointed, and Huff assured
her that he was not. Huff told them that Terry was looking forward to having Don Sr. bring
the papers, and Rhoda said, “Jerry, that’s great. You really saved the day there.” 
           The agreement not to admit the second codicil to Mrs. Morrow’s will to probate,
signed by Rhoda and Terry, was admitted into evidence. In addition, photographs showing
Rhoda, Don Sr., and the Rodriguez family and the Fernandezes at the formal signing of the
Kapital Trust were admitted into evidence. 
The Verdict and JNOV
           The case was tried to a jury, which found that (1) Chamberlain breached its fiduciary
duty to Rhoda; (2) the negligence of both Chamberlain and Rhoda proximately caused
damage to Rhoda; (3) Chamberlain was 20% and Rhoda was 80% negligent; (4) Chamberlain
committed fraud against Rhoda; (5) Chamberlain was part of a conspiracy that damaged
Rhoda; (6) Chamberlain knowingly engaged in an unconscionable action or course of action
that was a producing cause of damage to Rhoda; (7) $325,000 would fairly and reasonably
compensate Rhoda for her injuries; (8) $0 would compensate Rhoda for her past and future
mental anguish, (9) $390,000 was a reasonable fee for Rhoda’s attorneys; (10) 1998 was the
earliest date Rhoda discovered or should have discovered Chamberlain’s breach of fiduciary
duty, negligence, fraud, or false, misleading or deceptive acts; (11) Don Sr. breached his
fiduciary duties to Rhoda regarding the foreign trust during their marriage; (12) Rhoda was
not guilty of laches in bringing her claim against the estate; (13) Rhoda was not estopped
from bringing her claim against the estate; (14) Rhoda had not waived the right to bring her
claim against the estate; (15) 1998 was the earliest date Rhoda discovered or should have
discovered the complained-of conduct of Don Sr.; and (16) the harm to Rhoda resulted from
malice of a vice-principal at Chamberlain. 
           Chamberlain filed a motion to disregard certain jury findings and to render a take-nothing judgment. The motion was based on several grounds, including the statute of
limitations. The trial court granted Chamberlain’s motion without specifying the grounds
and rendered judgment that Rhoda take nothing from Chamberlain and the Estate. 
           Rhoda presents eight issues challenging the trial court’s judgment, contending that the
contributory negligence finding does not negate the jury’s findings in her favor on her claims
against Chamberlain for breach of fiduciary duty, fraud, conspiracy and violations of the
Deceptive Trades Practices Act (issues one, three, and four), the evidence supports the
findings regarding the discovery rule (issue two) and malice (issue seven), the trial court
erred in failing to grant her claim for fee disgorgement (issue five) and in prematurely
discharging the jury before submitting a jury question on exemplary damages (issue six), and
the trial court erred in rendering a judgment notwithstanding the verdict (JNOV) in favor of
the Estate and in failing to impose a constructive trust against the estate (issue eight). 
DISCUSSION
Standard of Review
           A trial court may disregard a jury’s findings and grant a motion for JNOV when there
is no evidence upon which the jury could have made its findings. Mancorp, Inc. v.
Culpepper, 802 S.W.2d 226, 227 (Tex. 1990); Lone Star Ford, Inc. v. McCormick, 838
S.W.2d 734, 738 (Tex. App.—Houston [1st Dist.] 1992, writ denied). In reviewing the grant
of a JNOV, the reviewing court must determine whether there is any evidence upon which
the jury could have made the finding, considering only the evidence and inferences that
support the finding and rejecting the evidence and inferences contrary to the finding. 
Navarette v. Temple Indep. School Dist., 706 S.W.2d 308, 309 (Tex. 1986). If there is more
than a scintilla of competent evidence to support the jury’s finding, then the JNOV will be
reversed. Southern States Transp., Inc. v. State, 774 S.W.2d 639, 640 (Tex. 1989).
           A JNOV is also permitted when a legal principle precludes recovery, even though all
the allegations are proven. Schindley v. Northeast Tex. Community College, 13 S.W.3d 62,
65 (Tex. App.—Texarkana 2000, pet denied); see also Stevenson v. Koutzarov, 795 S.W.2d
313, 319-20 (Tex. App.—Houston [1st Dist.] 1990, writ denied) (holding trial court erred in
denying motion for JNOV because claims were barred by limitations). 
Statute of Limitations
           In her second issue, Rhoda asks, “Was there some evidence to support the jury
findings as to the discovery rule application in Questions 10 - 13 relating to Plaintiff’s
independent liability and damage findings against the attorneys?” She contends that her own
testimony and that of Don Jr. is sufficient to support the discovery rule findings by the jury.



           Limitations generally begin to run when facts have come into existence that authorize
a claimant to seek a judicial remedy. Johnson & Higgins of Tex., Inc. v. Kenneco Energy,
Inc., 962 S.W.2d 507, 514 (Tex. 1998). The discovery rule is an exception to this general
rule and operates to toll the statute of limitations until the plaintiff discovers, or by exercising
reasonable care and diligence should have discovered, the nature of his injury. Willis v.
Maverick, 760 S.W.2d 642, 646 (Tex. 1988). To avail himself of the discovery rule, the
plaintiff must plead the rule and has the burden of proving and securing findings in his favor. 
Woods v. William M. Mercer, Inc., 769 S.W.2d 515, 518 (Tex. 1988). 
           All of Rhoda’s claims against Chamberlain were subject to either the two-year or four-year statute of limitations. She filed her lawsuit against Chamberlain on June 29, 1999. 
Therefore, it was her burden to establish that she did not discover, and in the exercise of
reasonable care and diligence could not have discovered, the conduct of Chamberlain of
which she complains until after June 29, 1995. 
           There is no direct evidence in the record to establish that Rhoda was present at the
formal execution of the Konig Trust indenture, although there is evidence that she was in
Mexico City visiting the Fernandezes at the time of the signing. However, there is evidence
that Rhoda was aware of the creation of the Kaufman Trust and Kapital Trust at the time they
were created. 
           Before the Kaufman Trust was created, Rhoda participated in the telephone
conference with Don Sr. and Huff, set forth above, during which they devised a plan to
persuade her brother, Terry, to agree not to probate the codicil that would create a trust for
his benefit because of the potential of that codicil to nullify the codicil that would create the
Kaufman Trust. It was clear from her statements that she knew the creation of a trust was
at stake, and the statements of Huff indicated that the trust created would be a foreign trust. 
It was also clear from the conversation that the purpose behind the trust was “to sock away
the big bucks.” 
           Rhoda and Don Sr. went to Mexico City for a formal execution of the Kapital Trust
Indenture. Photographs were made of a celebratory dinner that included Joaquin and
Etelvina Rodriguez and their three children, the Fernandezes, and the Tomascos. The
photographs show members of the group, including Rhoda, gathered around a table as
different individuals sign the documents. 
           At trial, Rhoda admitted that she had knowledge of foreign trusts before August 1998. 
She said, “I heard discussions about it from my husband but I never knew details.” 
           On April 24, 1995, Don Sr. filed an Inventory and Appraisement in the divorce case. 
The Certificate of Service in that document shows that a copy of that document was served
on Rhoda’s attorney on April 20, 1995. The Inventory and Appraisement did not list any
foreign trusts. 
           Under these facts, there is no evidence that Rhoda did not discover, and could not
have discovered, her causes of action against Chamberlain. Furthermore, the evidence
established that Rhoda knew about the creation of foreign trusts in 1984 and that she knew
or should have known by April 20, 1995 that these trusts were not included in Don Sr.’s
inventory of community property and would, therefore, not be included in the division of
property. When Rhoda sued Chamberlain on June 29, 1999, both the two-year and four-year
statutes of limitations had expired. Accordingly, her claims against Chamberlain were time-
barred.
           We overrule Rhoda’s second issue. Because we hold that Rhoda’s claims against
Chamberlain were barred by limitations, we need not consider her issues one and three
through seven. 
Claim Against the Estate
           In her eighth issue, Rhoda contends that the “trial court erred in granting a judgment
notwithstanding the verdict in favor of the Estate and in failing to impress a constructive trust
under the circumstances.” Rhoda first complains that the trial court improperly granted
judgment for the Estate on the basis of Chamberlain’s motion for JNOV, arguing that
Chamberlain lacked standing to assert a motion on the Estate’s behalf. We note that the
judgment does not recite that the take-nothing judgment in favor of the Estate is awarded on
the basis of Chamberlain’s motion. 
           Rhoda asserts, “The evidence amply supports the jury’s finding of fraud as against the
wife’s interests.” Although Rhoda does not direct us to any specific evidence, we will
assume, for the purposes of this issue, that she is correct. 
           The finding against the estate is in Question No. 14, which asks the following
question: 
Did Donald J. Tomasco, Sr. breach his fiduciary duties to Rhoda
Tomasco regarding the foreign trust during their marriage? 
 
The term “fiduciary duty” means a relationship of confidence and
trust that exists between a husband and wife with regard to that portion
of the community property that each controls. This relationship
requires that the spouses use the utmost good faith and frankness in
their dealings with each other. 
 
Answer “Yes” or “No.” 

The jury answered “Yes.” Question numbers 15, 16, and 17 asked whether Rhoda was guilty
of laches in bringing her claim against the estate, whether she was estopped from bringing
her claim, and whether she had waived the right to bring her claim. The jury answered each
of these questions “No.” Question number 18 asked the jury to find the earliest date on
which Rhoda discovered or, in the exercise of reasonable care and diligence should have
discovered the conduct of Don Sr. of which she complains in this suit. The jury answered
“1998.” 
           Based on the jury’s responses to question numbers 14 through 18, Rhoda filed a
motion for entry of judgment that requested the trial court to impose a constructive trust in
favor of Rhoda on the assets held in the Konig Trust, the Dyna Trust, the Intergroup Trust,
and any other foreign trusts into which Don Sr. had placed assets or had directed that assets
be placed. She now complains of the denial of that motion.
           To impose a constructive trust, there must be (1) a breach of a confidential
relationship or actual fraud, (2) unjust enrichment of the wrongdoer, and (3) tracing to an
identifiable res. Mowbray v. Avery, 76 S.W.3d 663, 681 n.27 (Tex. App.—Corpus Christi
2002, pet. denied). Here, although the res is the trust assets, Rhoda does not direct us to any
evidence that established that the Estate has ownership, possession, or control of those assets. 
The Konig Trust’s Trustee, who was, at the time of trial, The Bank of Butterfield, and the
trustees of the other trusts mentioned in Rhoda’s motion hold the trusts for the benefit of the
beneficiaries. There is no evidence that the trusts or the trustees have any connection with
the Estate. Moreover, neither the trusts nor the trustees were parties to this lawsuit. See
Starcrest Trust v. Berry, 926 S.W.2d 343, 355 (Tex. App.—Austin 1996, no writ)
(recognizing general rule that trustee and beneficiaries should be made parties to suits
involving trust property). Therefore, the trial court had no power to impose a constructive
trust on the assets of the trusts. Accordingly, we hold that the trial court did not err in
rendering a take-nothing judgment in the Estate’s favor. 
           We overrule Rhoda’s eighth issue. 
CONCLUSION
           We affirm the judgment.
 
                                                                  Sam Nuchia
                                                                  Justice

Panel consists of Justices Nuchia, Alcala, and Hanks.